825 A.2d 995

**MAMSI LIFE & HEALTH INSURANCE COMPANY**

v.

**John W. CALLAWAY.**

**No. 98, Sept. Term, 2002.**

Court of Appeals of Maryland.

June 11, 2003.

Richard A. DeTar (Demetrois G. Kaouris, Miles & Stock-bridge, P.C., on brief), Easton, for petitioner.

John B. Robins, IV (John B. Robins, IV, P.A., on brief), Salisbury, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

HARRELL, J.

## I.

## A.

What is autoerotic asphyxiation? Also known also as hypoxyphilia, it is classified as a mental disorder falling into the category of "Sexual Masochism" and involves "sexual arousal by oxygen deprivation obtained by means of chest compression, noose, ligature, plastic bag, mask, or chemicals." Diagnostic and Statistical Manual of the American Psychiatric Association, § 302.83, at 529 (4th ed.) ("DSM–IV"). Suffocation devices are employed for the purpose of "limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1450 (5th Cir.1995). Nerve centers in the brain are stimulated by asphyxia, which "produces a state of hypercapnia (an increase in carbon dioxide in the blood) and a concomitant state of hypoxia (a decrease in oxygen in the blood), all of which result in an increased intensity of sexual gratification." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir.2002).

The medical literature also informs that, although those who habitually practice autoerotic asphyxiation utilize escape mechanisms to protect against terminal suffocation in the event of a loss of consciousness, unintended deaths sometimes occur, primarily as a consequence of errors in the placement of the noose or ligature or other mistakes. DSM–IV, § 302.83, at 529 (estimating that "two hypoxyphilia-caused deaths per million population are detected and reported each year"). Autoerotic asphyxiation more likely than not, however, results in a nonfatal outcome. *Todd,* 47 F.3d at 1457.

Those who engage in autoerotic activities do not seek to lose consciousness, rather, their "sexuoerotic arousal and attainment of orgasm depend[ ] on self-strangulation and asphyxiation up to, but not including, loss of consciousness." The Autoerotic Asphyxiation Syndrome in Adolescent and Young Adult Males (1996). The optimum degree of that cerebral anoxia (interference with the blood supply to the brain), we are told, is only meant to reach the point at which it is perceived as giddiness, lightheadedness, and exhilaration, which reinforces the masturbatory sensation. Andrew P. Jenkins, *When Self–Pleasuring Becomes Self–Destruction: Autoerotic Asphyxiation Paraphilia*, The International Electronic Journal of Health Education 209 (2000).

## B.

On 5 July 2000, David B. Callaway (sometimes referred to here as the "Insured") was found dead in his home in Wicomico County, Maryland. The circumstances of his death are not in dispute. At the time of his death, he was engaged in an act of autoerotic asphyxiation. The detective investigating the death found his nude body lying on its back. His hands were tied behind his back and his feet were bound together at the ankles with rope. A plastic bag covered his head and a brown belt was tightened around his neck. The wall opposite the body was covered "with a large amount of centerfold pictures of naked females." [1]

---

1. The Report of the Post Mortem Examination, dated 11 October 2000, further described the scene as follows:

> There was also a yellow 1/4" synthetic rope attached to the loop binding the hands with a quick release knot secured by a wooden clothes pin. This rope was attached to a pulley to the above-mentioned leather belt around the neck and, according to the investigation reports, was strung through two additional pulleys attached to the ceiling of the room with a 25–pound weight at the end. Reportedly, an additional piece of rope was tied to the line at the ceiling between the pulleys. Pulling of this rope would cause lifting of the attached weight, releasing the tension applied to the neck loops and wrists. The legs were tied at the level of the malleoli [ankle bones] with four loops of 1/4" cotton rope tied between the legs, with

The autopsy, performed on 6 July 2000, revealed the "immediate cause" of death to be "asphyxiation." The manner of the Insured's death was characterized as an "accident" by the Assistant Medical Examiner who performed the autopsy. The Report of the Post Mortem Examination (the "Report") likewise indicated that the Insured died of "asphyxiation" and the manner of death was described as an "accident." It was also the Medical Examiner's opinion that the elaborate arrangement described in n. 1, *supra*, was a release mechanism designed by the Insured to prevent ultimate asphyxiation. He further observed that the complexity of the arrangement was typical for that type of erotic activity and concluded that "[t]he results of the autopsy and investigation indicate that the decedent accidentally asphyxiated (suffocated) while engaged in an erotic activity."

Mr. Callaway, at the time of his death, owned a life insurance policy (the "Policy") issued by MAMSI Life and Health Insurance Company ("MAMSI"). The designated beneficiaries of the Policy were his brother, John W. Callaway, and his nephews, John Callaway, Jr. and Bennett J. Callaway (the "Beneficiaries"). When the Beneficiaries sought to recover the death benefits under the Policy, MAMSI denied payment. MAMSI claimed that the Insured's death was not the result of an accident, but was instead the result of intentional self-injury.

The Policy provided for the payment of death benefits if the Insured sustained a loss of life "because of an injury caused by an accident." Among the policy exclusions from coverage was one for death resulting from "intentional self-injury." The Policy provided in relevant part:

Accidental Death and Dismemberment Benefits.

*Benefit Payable*—If an *Insured* suffers a covered loss because of an *injury caused by an accident*, the loss must occur within 90 days after the date of the accident. Notice

transverse loops forming a Figure "8" knot. ... The deceased held a 4–1/2 foot long strap in his right hand.

of the loss must be received by us within 30 days after the start of the covered loss. We will pay the benefit amount when we receive proof, satisfactory to us, of a covered loss within 90 days of the date of the loss.

A covered loss means:

loss of life;

. . . .

*Benefit Amounts*—We will pay the full benefit amount as shown in the Schedule of Benefits for loss of:

life;

. . . .

*Exclusions*—No benefit will be paid for any loss that results from or is caused directly, indirectly, wholly or partly by:

*intentional self-injury,* suicide or attempted suicide, while sane or insane; . . . .

(Emphasis added).

On 16 October 2000, the Beneficiaries instituted suit against MAMSI in the Circuit Court for Wicomico County, alleging breach of the insurance contract. MAMSI filed a Motion to Dismiss or, In the Alternative, Motion for Summary Judgment, in response to the complaint. MAMSI asserted that the Insured's intentional act of depriving his brain of oxygen injured it, thereby rendering it incapable of functioning which caused his unintended death. The Insured's death was therefore the result of self-inflicted injury and not covered under the Policy.

The Beneficiaries responded to MAMSI's Motion for Summary Judgment with one of their own. The Beneficiaries argued that the insurance policy provided coverage for death resulting from asphyxiation while voluntarily engaged in autoerotic activity and that the death resulting from such activity was not a "self-inflicted" injury because of the existence of the escape mechanism, indicating the Insured's intent *not* to injure himself. His injury, therefore, was an accident.

The hearing on the dueling motions was held on 20 February 2001. At the hearing, the parties stipulated that the

Policy was unambiguous and that there was no dispute as to material facts. The Circuit Court, therefore, made the following findings:

[I]t appears to this Court as both counsel agree that the policy involved in this case is unambiguous. It provides for the payment of benefits if an insured suffers a covered loss because of an injury caused by an accident. A covered loss is loss of life. So, therefore, if death occurs because of an injury caused by an accident, then there would be the payment of benefits from the Defendant to the Plaintiff. However, if death was not due to an injury caused by an accident, then the policy does not provide coverage.

The Court believes that this case, the policy language is for legal purposes basically the same as the policies that covered death as a result of an accidental means.

I have a great deal of difficulty finding any difference between that language and the language used in this case.

The issue was dealt with in Consumers Life Insurance Company versus Smith, and there, the Court found that when somebody got drunk and drove an automobile and ran into a tree or something of that nature, then the bodily injury was caused by accident.

The Court made the distinction between accidental death and death by accidental means, and the Court used the language, the direct and proximate cause of the death of the insured was an automobile accident. He did not die from intoxication. Had he died from intoxication, then at least in my opinion, there would have been no coverage in that case, and had he died from intoxication, the Court believes that the facts in that case would have been analogous to the facts in this case.

In this case, the insured intended to cut off his air supply. The cutting off of the air supply caused his death. The Court believes that that is not a death caused because of an injury caused by an accident. He intended the act that resulted in his death. So the Court is going to grant the Defendant's Motion for Summary Judgment.

In addition, the Court believes that when you intend to cut off your air supply, you are causing a self-injury and that the exclusion would also apply to exclude benefits in this case. Therefore, the Court will enter Summary Judgment in favor of the Defendant.

## C.

The Beneficiaries appealed to the Court of Special Appeals. They argued that the trial court failed to view the facts in a light most favorable to the Beneficiaries and failed to draw reasonable inferences in their favor from the undisputed facts. The determinations by law enforcement officers and medical personnel that the death was an accident should not have been given such short shrift, the Beneficiaries argued. Furthermore, the Beneficiaries contended that the Insured's death was the result of an injury caused by an accident within the meaning of the Policy. They relied on a statement in *Consumers Life Ins. Co. v. Smith*, 86 Md.App. 570, 587 A.2d 1119 (1991), to support their assertion that "accident" is an unambiguous word with a singular meaning. MAMSI argued in reply that the Insured's death was not the result of an injury caused by an accident and that even if it were, the Beneficiaries would be precluded from recovering benefits because the Insured's death was the result of intentional self-injury.

The Court of Special Appeals, in a reported opinion (*Callaway v. Mamsi*, 145 Md.App. 567, 806 A.2d 274 (2002)), reversed the lower court, holding that: (1) the death resulted from an accident, and (2) a brief intentional reduction in the flow of oxygen to the brain was not an "injury" within the meaning of the intentional injury exclusion. Applying principles of contract construction, the intermediate appellate court concluded that it was required to interpret the terms "accident" and "injury" in order to properly construe the coverage of the Policy. 145 Md.App. at 591, 806 A.2d at 288. The court noted that "accident" and "injury" were ambiguous terms because they may have more than one meaning and were not defined in the Policy. *Id.* Thus, the court turned to extrinsic sources in aid of interpreting the Policy. It claimed to

construe those terms by ascribing to them their ordinary meaning as a lay person would understand them. The court further noted that, because these Policy terms were ambiguous, they must be construed against MAMSI as the drafter of the contract and construed from the Insured's perspective. *Id.* The court adopted a definition of "injury" derived from Black's Law Dictionary, Seventh Edition (1999), Funk & Wagnalls Encyclopedic College Dictionary (1968), and Webster's 11 New Riverside University Dictionary (1994). 145 Md.App. at 592, 806 A.2d at 288. Black's defined "bodily injury" as "physical damage to a person's body;" and "accidental injury" as an "injury resulting from external, violent, and unanticipated causes." Funk & Wagnalls defined "injury" as follows: 1. Harm, damage, or grievous distress inflicted or suffered. 2. A particular instance of such harm; an internal injury. 3. *Law.* Any wrong or damage done to another person, his reputation or property. Webster's offered the following definition of "injury": "1. Damage of or to a person, property, reputation, or thing. 2. A wound or other specific damage. 3. *Law.* A wrong or damage done to a person or to his or her property, reputation, or rights when caused by the wrongful act of another."

The court also relied on the definition of "accident" utilized in *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 753 A.2d 533 (2000). 145 Md.App. at 592, 806 A.2d at 288–89. *Cole* involved an insured who was shot and killed as she sat in the passenger seat of her idling van, while the vehicle was parked in a third party's driveway. The insured's husband had driven the van there to pick up for visitation his child by a former marriage. The husband's ex-father-in-law came out of the house and, while shooting at Mr. Cole, shot and killed Ms. Cole. Ms. Cole's automobile liability policy covered the death of an insured caused by an "accident," but the insurer denied benefits on the ground that her death was not the result of an accident. This Court disagreed with the insurer. We referred to the definition of "accident" in one of our earlier cases, *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 248 Md. 148, 150, 235 A.2d 556 (1967): "a happening; an event

that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect from a known cause, and therefore not expected." We found the definition in *Harleysville* to be incomplete, however, because it failed to establish "through whose eyes one should analyze whether an insured's death was the result of an accident." *Cole*, 359 Md. at 307, 753 A.2d at 538. Grafting a perspective requirement onto the *Harleysville* definition of "accident," we determined that the appropriate test is "whether the damage caused by the actor's intentional conduct was 'unforeseen, unusual and unexpected,'" and "not whether the actor intended the effects of his or her actions." 359 Md. at 311, 753 A.2d at 540. We reasoned that, from the victim's perspective, the shooting was without foresight or expectation and therefore constituted an accident despite the intentional, non-accidental nature of the conduct from the assailant's perspective. *Id.* To reach our conclusion in *Cole*, we employed a two-part test utilized in *Lincoln Nat'l Life Ins. Co. v. Evans*, 943 F.Supp. 564 (D.Md.1996), and derived from the U.S. First Circuit Court of Appeals's decision in *Wickman v. Northwestern Nat'l Ins.*, 908 F.2d 1077 (1990). The test has subjective and objective components. The court first inquires, under the subjective component, as to whether the insured "expected an attack similar to the kind which occurred." If the evidence is insufficient to resolve that question, then the court proceeds to the objective element, "whether a reasonable person with the same knowledge and experience as the insured would have viewed the injury as highly likely to occur in light of the insured's past conduct." If the answer to the second prong is "no," then the insured's death was the result of an "accident." *Cole*, 359 Md. at 314, 753 A.2d at 542.

In the absence of reported Maryland cases specifically addressing death by autoerotic asphyxiation in a life insurance policy context, the intermediate appellate court looked to cases from other jurisdictions for guidance. Based on our reasoning in *Cole* and the recent federal Ninth Circuit Court of Appeals's decision in *Padfield*, the court found Callaway's death to be accidental pursuant to the terms of the Policy. 145 Md.App. at 601–02, 806 A.2d at 294. Applying the two-part *Cole* test,

the court concluded that the undisputed facts were not sufficient to satisfy the subjective component of the test as there was no indication whether the Insured subjectively lacked an expectation of death or injury. *Id.* It also concluded that under the second prong, "whether a reasonable person ... would have viewed the injury as highly likely to occur," it was objectively reasonable that the Insured would not have considered the fatal injury highly likely to occur. 145 Md.App. at 602–03, 806 A.2d at 294–95. The intermediate appellate court therefore decided that the death was an accident and proceeded to consider whether the Insured committed "intentional self-injury." The court found that he did not because the goal was to give himself sexual gratification, not to injure himself, and therefore the injury could not have been intentional. 145 Md.App. at 603, 806 A.2d at 295. But for the accident that occurred, the Insured would not have suffered any injury. The Court of Special Appeals analogized autoerotic asphyxiation with other activities that are inherently dangerous, although apparently more socially acceptable in the mainstream of extreme human recreational activities—skydiving, bungee jumping, white water rafting, parasailing, mountain climbing, and scuba diving—to support its finding that the injuries sustained by the Insured were the result of an accident and were not intentionally self-inflicted. 145 Md.App. at 604, 806 A.2d at 295–96.

## II.

We granted MAMSI's petition for certiorari, 372 Md. 429, 813 A.2d 257 (2002), to consider the following issues, notwithstanding the "Serbonian bog" warning sometimes attached to the subject matter of insurance policy interpretations of this general type [2]:

 I. Whether the Court of Special Appeals erred in concluding as a matter of law that the policy at issue was

---

**2.** "Serbonian bog" is derived judicially from Justice Cardozo's dissenting opinion in *Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934, 937 (1934) (Cardozo, J., dissenting). He explained therein that, in an insurance case, attempting to distin-

ambiguous and according the words "injury" and "accident" their ordinary meanings, and if it was, whether the case should be remanded to give MAMSI the opportunity to introduce evidence to clarify the meaning of the insurance policy.

II. Whether the Insured's death, caused by autoerotic asphyxiation, was an accidental death within the terms of the insurance policy.

III. Whether death resulting from autoerotic asphyxiation was death from intentional self-injury as described in the insurance policy.

----

guish "between accidental results and accidental means will plunge this branch of law into a Serbonian bog."

We expand, where Cardozo apparently felt no need for his assumptively more literate readership, a bit on the literary and geographic etiology and practical connotation of the "Serbonian bog" reference. Judge Karwacki, in his dissent in *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 661–62, 679 A.2d 540, 553 (1996), observed that the description emanated from Book 2 of *Paradise Lost:*

Beyond this flood a frozen Continent
Lies dark and wilde, beat with perpetual storms
Of Whirlwind and dire Hail, which on firm land
Thaws not, but gathers heap, and ruin seems
Of ancient pile; all else deep snow and ice,
*A gulf profound as that SERBONIAN Bog*
*Betwixt DAMIATA and mount CASIUS old,*
*Where Armies whole have sunk:* the parching Air
Burns frore, and cold performs th' effect of Fire.
Thither by harpy-footed Furies hail'd,
At certain revolutions all the damn'd
Are brought: and feel by turns the bitter change
Of fierce extreams, extreams by change more fierce,
From Beds of raging Fire to starve in Ice
Thir soft Ethereal warmth, and there to pine
Immovable, infixt, and frozen round,
Periods of time, thence hurried back to fire.

John Milton, *Paradise Lost*, bk. 2, 1.592 (1667). Judge Karwacki also pointed out that Lake Serbonis, which the bog apparently bordered, was situated in lower ancient Egypt, near Palestine. *Sheets*, 342 Md. at 662, 679 A.2d at 553.

Although the reference is perhaps more obscure today than it was in Justice Cardozo's time, the message is clear in context. It refers to a "mess from which there is no way of extricating oneself." E. Cobham Brewer, *Dictionary of Phrase and Fable*, 1121–22 (1898).

IV. Whether the two-part inquiry in *Cole* applies only when the act that is alleged to be an accident is an intentional tort committed by a person other than the insured. If the two-part inquiry adopted in *Cole* applies in all cases involving a death caused by an accident, whether *Gordon* [*v. Metro. Life Ins. Co.*, 256 Md. 320, 260 A.2d 338 (1970)] is overruled so that Maryland law no longer recognizes the distinction between accidental means and accidental results.

We find Question III to be dispositive of this case. Accordingly, we shall not reach or decide the other questions.

## III.

MAMSI asserts that the appellate courts of Maryland have not directly addressed an insurance policy with a self-inflicted injury exclusion and that those courts from other states that have interpreted insurance policies containing an exclusion for death caused by intentional self-injury have concluded that the act of autoerotic asphyxiation constitutes self-injury. MAMSI begins by referring us to a case from the U.S. District Court for the Southern District of Iowa, *Sigler v. Mut. Benefit Life Ins. Co.*, 506 F.Supp. 542 (S.D.Iowa), *aff'd* 663 F.2d 49 (8th Cir.1981). That court explained that the act of engaging in autoerotic asphyxiation constituted a self-inflicted injury because the insured voluntarily acted with the intent to temporarily restrict his air supply. 506 F.Supp. at 545. The U.S. Court of Appeals for the Fifth Circuit found on similar facts that, although the insured only intended partial strangulation and did not intend to kill himself, partial strangulation in the absence of death would have been an injury in and of itself. *Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478 (5th Cir. 1992). The U.S. District Court for the Western District of New York likewise entered summary judgment in favor of an insurer, reasoning that by the insured constricting his windpipe and reducing the flow of oxygen to his brain, he caused himself to asphyxiate leading to his death, which was logically the "injury" suffered in terms of the insurance policy. *Critchlow v. First UNUM Life Ins. Co.*, 198 F.Supp.2d 318 (W.D.N.Y.2002).

MAMSI criticizes the Court of Special Appeals's reliance on the majority opinion in *Padfield* arguing that the *Sigler, Sims,* and *Critchlow* cases are more compellingly reasoned. MAMSI also views the differing methods of asphyxiation employed by the insured in *Padfield* and the insured in this case to be significant so as to merit a different outcome in the present matter.[3] MAMSI reiterates the comments made by the dissent in *Padfield* that no court prior to that case had ruled, as a matter of law, in favor of the insured in cases where a self-inflicted injury exclusion existed. MAMSI contends that those cases holding that coverage existed for a death caused by autoerotic asphyxiation likely would have been decided differently had the policies contained self-inflicted injury exclusions. *See Todd,* 47 F.3d at 1454 n. 6, 1457; *Bennett v. Am. Int'l Life Assurance Co.,* 956 F.Supp. 201, 207, 210 (N.D.N.Y.1997); *Parker v. Danaher Corp.,* 851 F.Supp. 1287, 1295 (W.D.Ark. 1994); *Kennedy v. Washington Nat'l Ins. Co.,* 136 Wis.2d 425, 401 N.W.2d 842, 846 (1987).

MAMSI responds to the Court of Special Appeals's analogy between autoerotic asphyxiation and more openly known forms of extreme recreational activities, such as skydiving and rockclimbing, with a quotation from the *Critchlow* court:

> Skydivers and rockclimbers do not set out to injure themselves, believing that they can stop the progress of the injury before it becomes severe enough to kill them. In contrast, by constricting the flow of oxygen to his brain, to the point where loss of consciousness and death were certain to occur if the pressure were not released in a relatively short time, the decedent did injure himself.

*Critchlow,* 198 F.Supp.2d at 327 (footnote omitted).

MAMSI claims that the language in the Policy providing coverage for death, "because of an injury caused by an acci-

---

**3.** The insured in *Padfield* met his death after engaging in autoerotic acts in the back of his van. He tied one end of a necktie around his neck and another end to the sliding door hinge. He died as a result of asphyxiation, but also there were traces of the liquid solvent Chlorohexanol in his blood. *Padfield v. AIG Life Ins.,* 290 F.3d 1121, 1123 (9th Cir.2002).

dent," requires that the injury be the result of an accident, not the death itself. An intentional injury leading to an unexpected death therefore would not be covered under the terms of the Policy. The manner of death indicated that the Insured died from asphyxiation and that he intended to asphyxiate himself. The injury, asphyxiation, was therefore intended although his death was not.

The Beneficiaries, Respondents here, argue that the Insured's death was not the result of intentional self-injury. They assert rather that the record demonstrates that the manner of death was accidental and not the result of self-inflicted injury. The medical experts and investigating officers rendering an opinion as to the cause of the Insured's death uniformly concluded that his death was accidental. The experts found it significant that escape mechanisms had been incorporated into the Insured's elaborate system of self-asphyxiation. The escape mechanisms indicated that he recognized the danger of what he was doing and neither intended nor expected injury to his person. His goal was self-sexual gratification rather than self-destruction. The Beneficiaries commend the Court of Special Appeals's interpretation of the term "injury," not defined in the Policy, according to its ordinary meaning.

The Beneficiaries support the interpretation of the word "injury" to mean "physical damage or harm to the body, whether permanent or temporary," as adopted by the intermediate appellate court. They agree with the statement made by that court that the goal of autoerotic asphyxiation, "fleeting hypoxia," is intended and "does not, in our view, constitute an injury with the meaning of the Policy.... [t]hose who survive the experience show no signs of physical injury or harm." 145 Md.App. at 603, 806 A.2d at 295. The Beneficiaries refer to the assertedly undetectable nature of autoerotic asphyxiation as evidence that engaging in such activity does not necessarily result in "injury." The Report of the Chief Medical Examiner does not present any evidence of physiological injury independent of the fact of death. Common knowledge, they claim, also defeats MAMSI's assertion that the partial strangulation

associated with a successful autoerotic experience is an injury in and of itself within the meaning of the Policy. The Beneficiaries argue that the Court of Special Appeals correctly analogized autoerotic asphyxiation to other inherently dangerous human activities such as skydiving, bungee jumping, and scuba diving. They further plead that by giving the word "injury" a meaning foreign to the understanding of the common man, the insurer can avoid liability to people who die from lung cancer as a result of smoking cigarettes or liver disease resulting from alcohol consumption. These "socially accepted" activities cause injury to the body although neither the smoker nor the drinker intend to inflict self-injury, nor do they inflict "injury" as that term is commonly understood.

The Beneficiaries also look outside of Maryland to jurisdictions addressing the circumstance of an insured's death from autoerotic asphyxiation. They claim that reviews undertaken by both the *Padfield* majority and the Court of Special Appeals in this case should lead us to conclude that entitlement to recovery in a given case is dependant upon the language of the policy at issue as well as the facts underlying the claim. The Beneficiaries, for example, caution that *Runge v. Metro. Life Ins.*, 537 F.2d 1157 (4th Cir.1976), *Patch v. Metro. Life Ins.*, 733 F.2d 302 (4th Cir.1984), and *Bennett v. Am. International Life Assurance Co.*, 956 F.Supp. 201 (N.D.N.Y.1997), applied Virginia law and that those decisions would not be valid necessarily under the laws of another state. Maryland does not follow Virginia law in its peculiar definition of accidental death and it is the language of the insurance contract that controls the rights and obligations of the contracting parties and beneficiaries.

In its reply brief, MAMSI reiterates that the only way to interpret the Policy to give meaning and effect to both the intentional self-injury exclusion and the suicide exclusion is to recognize that the intentional self-injury exclusion precludes recovery for intentional actions that have a high likelihood of resulting in an injury, although the injury was not necessarily intended nor recognized by the insured as highly likely to result in death. MAMSI urges us to recognize that the focus

of the Court of Special Appeals on whether the Insured should have expected to die from his actions violates well-established rules of contract construction and ignores the plain meaning and distinction between the separate intentional self-injury exclusion and the suicide exclusion by functionally merging the intentional self-injury exclusion into the suicide exclusion. MAMSI also renewed its assertion that intentionally cutting off the supply of oxygen to the brain with the specific intention of inducing "transient cerebral hypoxia" constitutes an injury. MAMSI deems it significant that, with the exception of *Padfield*, no court has ever found against the insurer as a matter of law in an autoerotic asphyxiation case where the policy contained a self-injury exclusion.

## IV.

### A.

The scope of our review of a judgment based on the grant of summary judgment is *de novo*. *Green v. H & R Block, Inc.*, 355 Md. 488, 502, 735 A.2d 1039, 1047 (1999); *Heat & Power v. Air Products*, 320 Md. 584, 590–92, 578 A.2d 1202, 1205–06 (1990). The appellate court has the same facts from the record before it and considers the same issues of law as the trial court and is tasked with determining whether the trial court reached the correct result as a matter of law. *Tyma v. Montgomery Co.*, 369 Md. 497, 504, 801 A.2d 148, 152 (2002); *Murphy v. Merzbacher*, 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997). Maryland Rule 2–501 governs the motion for summary judgment and provides that the court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

When both sides file cross-motions for summary judgment, as in the present case, the judge must assess each party's motion on its merits, drawing all reasonable factual inferences against the moving party. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 174, 776 A.2d 645, 650 (2001). Where, as

here, the material facts are undisputed, it is for the Court to decide whether the trial court accurately resolved the dispute of law. *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001). We ordinarily will uphold the grant of summary judgment only on a ground relied on by the trial court. Md. Rule 8–131(a)[4]; *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872, 873 (1995). We must determine in this case whether the trial court correctly interpreted the Policy provisions to conclude that the Insured's death was excluded from coverage as an intentional self-injury.

### B.

Our interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties. *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 165, 702 A.2d 767, 771 (1997). In our interpretation of the contract, we seek to give the words their "customary, ordinary, and accepted meaning." *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991). When the terms of a contract are ambiguous, courts look to extrinsic sources to ascertain the meaning of the terms. *Cole*, 359 Md. at 305, 753 A.2d at 537. If the terms are unambiguous, the court may construe the insurance contract as a matter of law. *Id.* A contract term is determined to be ambiguous if "a reasonably prudent person" would understand the term as susceptible to more than one possible meaning. 359 Md. at 306, 753 A.2d at 537. The determination of whether language is susceptible to more than one meaning includes consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). Although Maryland law does not construe

---

4. Md. Rule 8–131(a) provides in part that "the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

insurance policies as a matter of course against the insurer, *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997), when a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer. *Dutta v. State Farm*, 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

C.

 Regardless of whether we were to agree that the Insured did not cause his death intentionally, the insurance policy limits recovery of accidental death benefits when death is the result of intentional self-injury. If the Insured did not intend to cause his death, the question becomes whether he intended to cause the injury that led to his death and whether asphyxiation is an "injury" within the Policy terms. The vast majority of cases from other jurisdictions discussing whether death by autoerotic asphyxiation is the result of an intentional self-inflicted injury have found that it is and denied payment of benefits on the basis of such an exclusion in the insurance policies.

Unlike our intermediate appellate court colleagues, we do not think it appropriate to collapse the analysis of "accident" and "injury" into a single inquiry. The language and structure of the Policy establish two separate and independent inquiries: first, whether the Insured's death was an accident under the Policy; and, if so, second, whether the death resulted from a self-inflicted injury pursuant to the exclusion. The first addresses the nature of the overall event, whereas the second addresses only causation. It is possible therefore to find the death itself to have been accidental although the Insured may have intended the events that eventually led to his death.

The U.S. Court of Appeals for the Fifth Circuit, in *Sims v. Monumental Gen. Ins. Co.*, 960 F.2d at 479, found that partial strangulation engaged in as part of autoerotic activity was an "injury" triggering the exclusion for intentionally self-inflicted injury contained in an accidental death insurance policy. The

court relied on Louisiana's definition of "intentional action" as "where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow." 960 F.2d at 480. The court found that the insured clearly intended to strangle himself partially and noted that the only question was whether partial strangulation was an injury. *Id.* The court noted evidence that partial strangulation involved tissue damage in the neck and depriving the brain of oxygen, and held that "partial strangulation is an injury in and of itself." *Id.* See *Sigler v. Mut. Benefit Life Ins.*, 506 F.Supp. 542 (S.D.Iowa 1981) (finding that temporarily restricting the supply of oxygen is an injury).

The court in *Cronin v. Zurich Am. Ins.*, 189 F.Supp.2d 29 (S.D.N.Y.2002) further described the nature of autoerotic asphyxiation noting: "The effect on the brain produced by this activity is abnormal; the higher cerebral functions of thought, consciousness and awareness are compromised; and a dangerous loss of coordination and self-control results. Temporary cell damage results, and reduced brain activity occurs." 189 F.Supp.2d at 38. That court held that the "purposefully self-inflicted injury" exclusion contained in the accidental death insurance policy at issue in *Cronin* encompassed the insured's act of hanging himself by the neck intending to deprive himself of oxygen in order to achieve a sexual "high." 189 F.Supp.2d at 39.

The *Critchlow* court also rejected the beneficiary's suggestion that intentional constriction of the insured's windpipe was not an "injury" under a self-inflicted injury exclusion to an accidental death policy. *Critchlow*, 198 F.Supp.2d at 323. That court plainly stated that the insured's actions "certainly did cause him injury, however; it led directly to his death." *Id.* The court reasoned "that it [asphyxiation] is possible to do so for a short period without causing lasting injury, or that injury or death does not immediately occur upon constriction of the trachea, does not mean that decedent's intentional act caused him no injury." *Id.*

Although making note of these cases, the Court of Special Appeals in the present case found the reasoning in the majority opinion in *Padfield* to be more persuasive. *Padfield* involved an autoerotic asphyxiation scenario where the insured died as a result of accidentally strangling himself. The insured, in the back of his van, tied one end of his necktie around his neck and tied the other end to the sliding door hinge located directly above him. The U.S. Court of Appeals for the Ninth Circuit did not agree with the insurer that autoerotic asphyxiation was itself an injury. 290 F.3d at 1127–28. The *Padfield* court instead thought that the temporary deprivation of oxygen the insured intended to experience was not the type of harm classified as an "injury." The injuries that actually resulted in his death, tissue injuries to the neck and the sustained period of time without blood flow, were found to be unintended. 290 F.3d at 1129. The dissent in *Padfield* argued that the act of tying a necktie around his neck with the intent to restrict the flow of oxygen to his brain was· an intentionally self-inflicted injury which resulted in the insured's death. 290 F.3d at 1130 (Leavy, J., dissenting). The dissent found that the injury was not only the tissue damage and ligature marks around the insured's neck, but also included "the intentional act of injuring his brain render[ing] it incapable of functioning." 290 F.3d at 1131 (Leavy, J., dissenting).

The Court of Special Appeals reasoned that the brief intentional reduction in the flow of oxygen was not an "injury" as that term is used in the Policy. The court determined that the layperson would understand "injury" to mean "physical damage or harm to the body, whether permanent or temporary." 145 Md.App. at 603, 806 A.2d at 295. The court concluded that "the fleeting hypoxia that is intended and achieved with a successful autoerotic experience does not, in our view, constitute an injury with the meaning of the Policy." *Id.* The court appealed to "common knowledge" to support its conclusion, observing that "[i]t is generally believed that one can safely go without oxygen for a brief period of time, without sustaining what is perceived as an injury." *Id.* Ac-

cording to the intermediate appellate court, autoerotic asphyxiation is similar to a swimmer holding his or her breath while under water without sustaining injury. *Id.* We disagree.

█ We take issue with the intermediate appellate court's attributions to the layperson described in its analysis. We conclude that a layperson would understand partial strangulation to be an injury as that term is commonly used. As the *Sigler* court observed, if another person had partially strangled the Insured there would be no argument that the strangulation was not an injury. 506 F.Supp. at 545. A layperson would consider hypoxia caused by partial strangulation to be an injury regardless of whether visible marks were left on the body. That the injured party also derived pleasure from the self-inflicted injury does not mean there was no injury. Hypoxia is widely defined as "a deficiency of oxygen reaching the tissues of the body." Injury may embrace internal or external damage or harm. The temporary deprivation of oxygen to the brain is a harm albeit only a temporary one in the case of successful autoerotic asphyxiation. We therefore resolve on the undisputed facts of this case that, by depriving his brain of oxygen, the Insured injured his brain and rendered it incapable of functioning, which eventually led to his death. The trial court correctly granted MAMSI's Motion for Summary Judgment on the basis of the exclusion in the Policy for intentional self-injury.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY; RESPONDENT TO PAY ALL COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*

BATTAGLIA J., dissenting.

I respectfully dissent for the reasons so well expressed by Court of Special Appeals Judge Hollander in her opinion in

*Callaway v. MAMSI Life & Health Ins. Co.,* 145 Md.App. 567, 806 A.2d 274 (2002).

Chief Judge BELL has authorized me to state that he joins in this dissent.