Brennan, Circuit Judge.
Linno Llenos died engaging in an act known as autoerotic asphyxiation. His widow and beneficiary, LeTran Tran, filed a claim with Minnesota Life Insurance Company, seeking the proceeds from Llenos's ERISA-governed life insurance policies. Minnesota Life paid most of her claims but denied coverage under Llenos's Accidental Death & Dismemberment policy riders. Minnesota Life determined Llenos's death was not accidental and fell under a policy exclusion for deaths resulting from "intentionally self-inflicted injury." The district court reversed, ruling that Llenos's death qualified as an accidental death and did not result from an intentionally self-inflicted injury.
Because a reasonable person would interpret Llenos's cause of death, autoerotic asphyxiation, to be an "intentionally self-inflicted injury," we reverse.
I. Background
The facts are not in dispute. In August 2016, while home alone in Wilmette, Illinois, Llenos hung a noose from a ceiling beam in his basement, stood up on a stool with the noose around his neck, and stepped off. Llenos died as a result. When Tran came home, she found her husband's body hanging in the basement and immediately called police. Though his death was initially reported a suicide, the medical examiner subsequently concluded from sexual paraphernalia on Llenos's body that he died performing autoerotic asphyxiation.
Autoerotic asphyxiation is a sexual practice by which a person purposefully restricts blood flow to the brain to induce a feeling of euphoria. "Asphyxiophilia" as defined in the DSM-5 is a subset of sexual masochism disorder, by which an "individual engages in the practice of achieving sexual arousal related to restriction of breathing." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 694 (5th ed. 2013). The pleasurable feeling experienced during autoerotic asphyxiation derives from cerebral hypoxia, or brain cell death from deprivation of oxygen. Acute to severe hypoxia can lead to loss of consciousness in ten to twenty seconds, permanent brain damage in three minutes, and death in four to five minutes.
Llenos was covered by two life insurance policies, a Basic Insurance Policy and a Supplemental Insurance Policy. These provided $ 517,000 in coverage. Each policy also included Accidental Death & Dismemberment ("AD&D") policy riders. The Basic Insurance Policy provided an additional *382 $ 10,000 of AD&D coverage, and the Supplemental Insurance Policy provided an additional $ 50,000 of AD&D coverage.
After her husband's death, Tran filed a claim with Minnesota Life, which paid the $ 517,000 but denied Tran's claim for the additional $ 60,000 in AD&D coverage based on two provisions (with identical text) in the policy riders. Minnesota Life concluded Llenos's death was not "accidental" under the AD&D riders. The insurer also took the position that Llenos's death fell under an exclusion for intentionally self-inflicted injury, which states:
In no event will we pay the accidental death or dismemberment benefit where an insured's death or dismemberment results from or is caused directly by any of the following: ... intentionally self-inflicted injury or any attempt at self-inflicted injury, whether sane or insane..."
(emphasis added). Tran appealed the decision internally at Minnesota Life and again was denied.
Tran then brought an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking the AD&D coverage payouts. After reviewing the stipulated facts from both parties, the district court awarded judgment in favor of Tran under FED. R. CIV. P. 52(a). The court ruled that Minnesota Life had conceded the death was accidental, and the only issue in dispute was whether autoerotic asphyxiation qualified as an "injury" under the policy's language. After reviewing precedent on autoerotic asphyxiation from other circuits, the court determined that reasonable minds could disagree about whether Llenos's intentional inducement of cerebral hypoxia was a self-inflicted injury within the meaning of the AD&D rider language. Because all policy ambiguities must be construed in favor of coverage, the district court ruled that the exclusion for intentional injuries did not apply to autoerotic asphyxiation and entered judgment in favor of Tran. Minnesota Life filed this appeal.
II. Discussion
Challenges to ERISA benefit determinations under 29 U.S.C. § 1132(a)(1)(B) are reviewed de novo when, like here, the plan does not grant discretionary authority to the plan fiduciary. Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ; Cheney v. Standard Ins. Co. , 831 F.3d 445, 449 (7th Cir. 2016). We apply federal common law to interpret policy terms. Schultz v. Aviall, Inc. Long Term Disability Plan , 670 F.3d 834, 838 (7th Cir. 2012). The federal common law of insurance contracts requires "that Plan terms be interpreted in an 'ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience.' " Sellers v. Zurich American Ins. Co. , 627 F.3d 627, 632 (7th Cir. 2010) (quoting Cannon v. Wittek Cos. Intern. , 60 F.3d 1282, 1284 (7th Cir. 1995) ). Where terms are ambiguous, courts construe them in favor of coverage. Santaella v. Metropolitan Life Ins. Co. , 123 F.3d 456, 461 (7th Cir. 1997).
Minnesota Life first challenges the district court's finding that the insurer waived its position that Llenos's death was not "accidental" under the language of the AD&D riders. But because the riders stipulate an accidental death is still excluded if it "result[ed] from or was caused directly by ... intentionally self-inflicted injury," and that is dispositive of this case, we address only the exclusions. To determine whether Llenos's death is excluded from AD&D coverage, we must determine first whether autoerotic asphyxiation is an "injury," and second, whether that injury was "intentionally self-inflicted."
*383 A. Autoerotic Asphyxiation As "Injury"
We interpret the meaning of "injury" as a layperson would commonly understand the word. Sellers , 627 F.3d at 632. The district court's analysis of whether autoerotic asphyxiation (and the accompanying cerebral hypoxia ) is an injury relied on three cases: a 1997 case from our court, Santaella v. Metropolitan Life Ins. Co. ; Padfield v. AIG Life Ins. Co. , 290 F.3d 1121 (9th Cir. 2002) ; and Critchlow v. First UNUM Life Ins., America , 378 F.3d 246 (2nd Cir. 2004). In Santaella , we held that an accidental overdose death did not result from intentionally self-inflicted injury because there was no evidence the woman intended to injure herself when she took too much of a legal prescription painkiller. 123 F.3d at 465. Here, the district court applied Santaella to the question of injury because it was "cited approvingly by the Ninth Circuit in Padfield ... ." Tran v. Minnesota Life Ins. Co. , No. 17-cv-450, 2018 WL 1156326, at *7 (N.D. Ill. Mar. 5, 2018).
But Padfield did not rely on Santaella for its determination that autoerotic asphyxiation is not an injury. Padfield cited Santaella in support only of its "intentionally self-inflicted" analysis. 290 F.3d at 1129-30. Indeed, Santaella sheds little light on the question of whether autoerotic asphyxiation is an injury, because the opinion did not explore the issue in any depth. In Santaella , we simply stated the facts did not show that the insured meant to injure herself. 123 F.3d at 465. The dose the insured ingested was relatively low to be fatal, and she was unaware of other medical conditions that made her particularly susceptible to an overdose. Id. There was no evidence "she was aware of the risk of serious injury or death" when she ingested the painkiller. Id. The entire discussion of injury amounted to only two paragraphs and was largely dependent on the case's facts. For these reasons, we do not find Santaella instructive on whether autoerotic asphyxiation is an injury.[1]
We turn next to the other two cases the district court relied on, Padfield and Critchlow . Both dealt with deaths by autoerotic asphyxiation, and both addressed policy exclusions for intentionally self-inflicted injury. This court has never adopted the reasoning used in Padfield and Critchlow , and we decline to do so here.[2] We find both cases grounded on a *384 false premise: that the act of strangling oneself is severable into distinct phases and distinct injuries. In Padfield , for example, the Ninth Circuit reasoned that what killed the insured was not the autoerotic asphyxiation, but the continued asphyxiation that occurred after he blacked out. Padfield , 290 F.3d at 1129. The same reasoning was applied in Critchlow , in which the Second Circuit found that Critchlow's death "was not caused by 'partial' strangulation but by the total loss of oxygen for a sustained period." 378 F.3d at 260.
We reject such reasoning because it artificially separates one continuous act into two or more parts. The insured in Padfield did not strangle himself in a nonlethal manner, then involuntarily shift into a different form of lethal strangulation. He pulled a necktie tightly around his neck to cut off oxygen to his brain; as the self-strangulation continued, he gradually lost consciousness and eventually died. Padfield , 290 F.3d at 1123-24. The insured in Critchlow died under very similar circumstances. Critchlow , 378 F.3d at 250. For both men, there was no intervening cause, and no break in the chain of causation: one act of autoerotic asphyxiation caused the hypoxia that killed them. The same reasoning applies here: Llenos placed a noose around his neck and stepped off a stool, strangling himself. The resulting hypoxia caused his euphoria, his black out, and his death-all the result of one intentionally inflicted injury.
Even if we accept the Ninth Circuit's premise that Llenos's autoerotic asphyxiation injury could be viewed in different "stages" of strangulation, the partial strangulation he sought to inflict is still an "injury" as the term is commonly understood, and thus falls within the exclusion. See, e.g. , MAMSI Life & Health Ins. Co. v. Callaway , 375 Md. 261, 825 A.2d 995, 1007 (2003) ("We conclude that a layperson would understand partial strangulation to be an injury as that term is commonly used."). The Ninth Circuit disagreed, holding that no "persons of average intelligence and experience" would consider partial strangulation to be an injury. Padfield , 290 F.3d at 1129. To the contrary, we find that an ordinary person would consider choking oneself by hanging from a noose to be an injury, even if that strangulation is only "partial." For example, if Llenos had partially strangled another person, there would be no debate he had inflicted an injury. The criminal codes within our circuit confirm this: in Wisconsin, Indiana, and Illinois, partial strangulation not resulting in death is a prosecutable offense. See, e.g. , WIS. STAT. § 940.235 (2007), ("Strangulation and Suffocation"); IND. CODE§ 35-42-2-9 (2017) ("Strangulation"); People v. James , 2017 IL 160148-U, ¶ 21, 2017 WL 6722835 (affirming a finding of "great bodily harm" when the strangulation victim survived, but during strangulation "could not breathe, lost consciousness, and suffered bruising to the neck."). Partial strangulation, even when not intended to cause death, is an injury. See, e.g. , Critchlow , 378 F.3d at 265 (Van Graafeiland, J., dissenting) ("Partial strangulation is an injury. A suicidal motive is not required.").
The dissent asserts we have ignored the sexual nature and pleasurable aim of autoerotic asphyxiation. Even acknowledging both, we fail to see their relevance. That Llenos performed the act on himself and enjoyed the accompanying euphoria does not make partial strangulation less of an *385 injury. Compare this with someone who engages in nonsuicidal self-injury, such as by cutting or burning himself. See AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 803 (5th ed. 2013) (DSM-5) (defining "Nonsuicidal Self-Injury" as when an individual has "engaged in intentional self-inflicted damage to the surface of his or her body of a sort likely to induce bleeding, bruising, or pain ... with the expectation that the injury will lead to only minor or moderate physical harm (i.e., there is no suicidal intent)."). The individual has still suffered an injury, regardless of the desired side effects. Autoerotic asphyxiation is no different. See Callaway , 825 A.2d at 1007 (Md. 2003) ("That the injured party also derived pleasure from the self-inflicted injury [of autoerotic asphyxiation ] does not mean there was no injury.").
Nor do we find relevant the popularity of autoerotic asphyxiation. The dissent contends no one would practice autoerotic asphyxiation if it were commonly understood to be an injury. This ignores scientific and psychological evidence to the contrary, including the DSM-5 which has an entire section that deals exclusively with sexual masochism disorder, defined as "sexual arousal from the act of being humiliated, beaten, bound, or otherwise made to suffer ..." DSM-5 at 694 (emphasis added). The same section defines autoerotic asphyxiation as a subset of sexual masochism disorder. Some people enjoy harming themselves. That harm is still an injury, regardless of its popularity or the pleasure some people may derive from it.
We also disagree with the Second Circuit's determination in Critchlow that oxygen deprivation, not partial strangulation, was the injury that killed the insured. See Critchlow , 378 F.3d at 260 ("Critchlow's death was not caused by 'partial' strangulation but by the total loss of oxygen for a sustained period."). Again, this improperly parses the causal chain of events: strangulation (the "injury") causes hypoxia, which leads to euphoria, then blackout, and eventually death. The Second Circuit's decision in Critchlow obscures the actual cause of death in autoerotic asphyxiation fatalities. For Llenos, as for the insured in Critchlow , there was no intervening cause or break in the chain of causation: absent the strangulation injury, Llenos never would have experienced hypoxia (and euphoria), lost consciousness, and died. Autoerotic asphyxiation was the ultimate and the proximate cause of Llenos's death. According to the language of the exclusion in the AD&D riders, then, the act of autoerotic asphyxiation was the "injury" that killed Llenos.
B. "Intentionally Self-Inflicted"
Having determined autoerotic asphyxiation is an injury, the remainder of our inquiry is straightforward. We decide whether an act was accidentally or intentionally done-as required by the "intentionally self-inflicted" exclusion in the AD&D riders-by applying the subjective/objective test we adopted in Santaella . 123 F.3d at 462-63. For an injury, we examine whether the injured individual had a subjective expectation of injuring himself, and if that cannot be determined, whether an expectation of injury was objectively reasonable.[3] Id. Here, we need *386 not reach the objective step in the analysis, because Llenos's subjective intent was clear.[4] Llenos intentionally performed autoerotic asphyxiation. Because that act itself is an injury, Llenos's death falls under the policy exclusion for intentionally self-inflicted injuries.
This holding does not conflict with our holding in Santaella , as the dissent and the Ninth Circuit suggests. See Padfield , 290 F.3d at 1130 ("This case is analytically identical to Santaella ."). In Santaella , we concluded there was no record evidence to indicate the insured had intended to injure herself by taking the prescription painkiller. Santaella , 123 F.3d at 465 ; see also Padfield , 290 F.3d at 1131 (Leavy, J., dissenting) (distinguishing the overdose in Santaella from autoerotic asphyxiation ). That differs from here: Llenos intentionally strangled himself so he could experience hypoxiainduced euphoria. That strangulation itself, partial or otherwise, was an injury that he intentionally inflicted on himself, unlike the insured in Santaella .
Strangling oneself to cut off oxygen to one's brain is an injury, full stop. When that injury kills, it is "an intentionally self-inflicted injury which resulted in death," regardless of whether it was done recreationally or with an intent to survive. Padfield , 290 F.3d at 1131 (Leavy, J., dissenting); Callaway , 825 A.2d at 1007. Under the plain and ordinary meaning of Llenos's AD&D riders, his death is excluded from coverage.[5]
III.
This opinion does not purport to establish a per se rule on insurance coverage for autoerotic asphyxiation. Interpretations of insurance policies are rarely amenable to per se rules because the policy language and factual circumstances involved in a death can vary, sometimes greatly. See, e.g. , Todd v. AIG Life Ins. Co. , 47 F.3d 1448, 1453 (5th Cir. 1995) (declining to establish a per se rule on whether autoerotic asphyxiation deaths are accidental); Cozzie v. Metropolitan Life Ins. Co. , 140 F.3d 1104, 1110 (7th Cir. 1998) (declining to establish a per se rule on whether drunk driving deaths are accidental). But under the language of this policy's exclusion for AD&D coverage, Llenos died from an "intentionally self-inflicted injury." Even assuming Llenos's death were accidental, Tran is not entitled to AD&D coverage and an additional $ 60,000 payment.
For these reasons, we REVERSE the judgment.

While Santaella does not speak much to injury, we agree with the dissent that its subjective/objective framework applies to whether an act was intentional or accidental, discussed further in Part II.B.

Our research did not yield any other circuit courts adopting the holdings in Padfield or Critchlow . Some federal district courts have rejected Padfield and Critchlow and found that autoerotic asphyxiation is an intentionally self-inflicted injury under a de novo standard. See, e.g. , Bryant v. AIG Life Ins. Co. , 2002 WL 34504617, at *5 (W.D. Mich. Nov. 27, 2002) ("Upon de novo review, and notwithstanding the Ninth Circuit's opinion to the contrary, this Court joins the overwhelming majority of federal courts in concluding that the partial strangulation involved in autoerotic asphyxiation comes within the plain meaning of 'intentionally self-inflicted injury.' "). At least one state supreme court also has concluded autoerotic asphyxiation is an intentionally self-inflicted injury. MAMSI Life & Health Ins. Co. v. Callaway , 375 Md. 261, 825 A.2d 995, 1007 (2003) ("We conclude that a layperson would understand partial strangulation to be an injury as that term is commonly used."); see also Book v. Monumental Life Ins. Co. , 271 Mich.App. 564, 723 N.W.2d 208 (2006) (following Callaway ).
We have located only about 20 autoerotic asphyxiation cases in federal court, and many are decided under the abuse of discretion standard, not de novo as here. In 2009, the Fifth Circuit in a per curiam decision affirmed the district court's decision that autoerotic asphyxiation is an intentionally self-inflicted injury, Estate of Thompson v. Sun Life Assur. Co. of Canada , 354 F. App'x 183, 186 (5th Cir. 2009), but that was under the abuse of discretion standard.

The Second and Ninth Circuits have likewise applied the subjective/objective test to "intentionally self-inflicted injury." See Critchlow , 378 F.3d at 259 ; Padfield , 290 F.3d at 1129. But Critchlow took the analysis a step further and decided that no intentionally self-inflicted injury is present where there was an objectively reasonable expectation of survival . Critchlow , 378 F.3d at 259 ("As to Critchlow's subjective intent, it has never been disputed that his death was subjectively unexpected and unintended .") (emphasis added). This conflates the injury analysis with the accidental death analysis; no suicidal intent is required for a finding of intentionally self-inflicted injury. In this regard, we do not follow Critchlow .

The dissent's discussion and reliance on the objective prong of Santaella raises an interesting question. The dissent discusses the various prophylactic measures Llenos took to avoid injury, such as a protective towel around the neck to avoid abrasion. Why, if the person did not think injury was a substantial certainty, would he use prophylactic measures during the act to mitigate injury?

This opinion has been circulated under Circuit Rule 40(e) among all judges of this court in regular active service. A majority did not favor rehearing the case en banc on the question of creating a conflict with the Second Circuit in Critchlow and the Ninth Circuit in Padfield . Chief Judge Wood and Circuit Judges Rovner and Hamilton voted to grant rehearing en banc.