864 A.2d 240

## PACIFIC EMPLOYERS INSURANCE COMPANY

v.

### Wayne D. EIG, et al.

**No. 1795, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 29, 2004.

Paul R. Koepff (O'Melveny & Myers, LLP on the brief), New York City. (Ronald W. Fuchs, Heather S. Wolff, Eccleston & Wolff, PC on the brief), Washington, DC, for Appellant.

Roy I. Neidermayer, Bethesda (David J. Kaminow on the brief), Rockville, for Appellee.

Panel: DEBORAH S. EYLER, ADKINS, and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Ret'd, Specially Assigned.

This is a dispute between a professional liability insurance company and its insured under a malpractice insurance policy covering the insured for mistakes made in the delivery of his professional services. The appellant and cross-appellee is Pacific Employers Insurance Company ("Pacific"). Attorney Wayne D. Eig is the appellee and cross-appellant.[1]

---

1. Linda Schwartz, Esq., who became Eig's law partner at some point after the Pacific policy went into effect but before the policy period terminated, is also a named appellee. That is apparently because the law firm of Eig and Schwartz, Chartered, became an "insured" under the policy upon the execution of a "Discovery Period Endorsement,"

## FACTS

The controversy stems from Eig's preparation of a second "Last Will and Testament" ("the second will") for his client, Mildred Colodny, who is now deceased.

Mrs. Colodny was a resident of the District of Columbia. Eig's offices were in Montgomery County, Maryland. In May of 1981, Mrs. Colodny executed a first "Last Will and Testament," also prepared by Eig. With that first will, Mrs. Colodny bequeathed all her personal property to her daughter, Elizabeth Colodny. She bequeathed one-half of the residuary of her estate to Elizabeth as well, and disposed of the remaining one-half of the residuary by making specific bequests to particular persons and entities.

Eig thereafter entered individually into the professional liability insurance policy with Pacific that is at issue in this appeal. The policy period began on March 1, 1987, and terminated on March 1, 1988.

In August of 1987, Mrs. Colodny asked Eig to prepare the second will and to create an *inter vivos* trust, to be known as "The Mildred Colodny Trust" (hereinafter referred to at times as "the trust"). Mrs. Colodny indicated that she still wanted all of her personal property to go to Elizabeth, but that she now wanted the entire residuary of her estate to "pour over" into the trust. One-half of the residuary would remain in the trust for the benefit of Elizabeth, with the remainder going to Elizabeth's children upon Elizabeth's death. The other half would be immediately distributed to the National Trust for Historic Preservation ("the National Trust").

Eig met with Mrs. Colodny several times between August of 1987 and early January of 1988 regarding her plans for the second will and the trust. On January 13, 1988, Eig completed a draft of the second will, by which he believed he effectuated Mrs. Colodny's wishes. Sometime between that date and March 1, 1988, Eig gave the draft to Mrs. Colodny.

---

which we shall discuss more fully herein. For the sake of convenience, we shall refer only to Eig as the appellee and cross-appellant.

The policy period for Eig's professional liability policy with Pacific terminated on March 1, 1988, but Eig obtained on behalf of his law firm, Eig and Schwartz, Chartered, a "Discovery Period Endorsement" that became effective on that date. The endorsement provided, in pertinent part, that, in exchange for an additional premium of $14,767, Pacific would provide coverage for "claims first made after the termination of the Policy Period," if those claims arose from an act or omission "which occurred prior to the termination of the Policy Period. . . ."

Nine days later, on March 10, 1988, Mrs. Colodny executed the second will in Eig's office, with Eig and Eig's legal assistant as witnesses. Subsequently, Mrs. Colodny executed two codicils to the will. The codicils have no bearing on the issues now before this Court.

Mrs. Colodny passed away on May 4, 1995. Through a series of events not made clear by the record extract and not relevant to this appeal, Eig became both personal representative of Mrs. Colodny's estate and successor trustee of The Mildred Colodny Trust. On May 24, 1995, Eig filed the second will with the Probate Division of the Superior Court of the District of Columbia.

The Probate Court *sua sponte* questioned the validity of the residuary clause in the second will. In February of 1997, it directed Eig, as personal representative of Mrs. Colodny's estate, to file a complaint for declaratory judgment to construe the will, and thus decide the validity of the residuary clause. Eig filed the declaratory judgment action in the Probate Court in March of 1997, asking that the residuary clause be declared valid. He named, as defendants, all of the beneficiaries of the will. The defendants were: Elizabeth Colodny; Elizabeth's minor son, Samuel E. Giddins; the National Trust; and Eig, as Trustee for The Mildred Colodny Trust.

Initially, both Elizabeth and the National Trust supported Eig's position that the residuary clause was valid. Elizabeth changed her position, however. She filed an answer to the complaint and a countercomplaint, by which she asserted that

the clause was invalid and that, as Mrs. Colodny's sole heir, she was entitled to inherit the entire residuary by intestacy. Elizabeth recognized that her gain was her minor son's loss. Through counsel, she later notified Eig that the invalidation of the residuary clause would deprive her son of his remainder interest in the trust. Eig took this to be notification of a claim by Giddins.

In April of 1998, prior to the resolution of the declaratory judgment action, Eig notified Pacific by letter that the action had been filed and that, if the Probate Court found the residuary clause to be invalid, Eig could be subject to claims by the National Trust and Samuel Giddins. Eig expressed his belief that Pacific would be required to defend any such claims in light of the discovery period endorsement that took effect on March 1, 1988. Subsequently, in June of 1998, the National Trust informed Eig by letter that if the residuary clause was declared invalid Eig would be liable to it. Eig promptly forwarded the letter to Pacific.

On September 30, 1998, Pacific informed Eig that it was denying coverage because it believed that any act or omission that led to the dispute over the residuary clause did not occur during the coverage period. Pacific added that another basis for the denial was Eig's failure to notify it promptly of the declaratory judgment action.

The Probate Court declared the residuary clause to be invalid on October 1, 1998. Eig noted an appeal from the decision. Elizabeth then filed a complaint to remove Eig as personal representative, asserting that the appeal was frivolous and was needlessly delaying the distribution of her mother's estate. Neither the appeal nor the complaint to remove Eig as personal representative was ever resolved, however. In December of 2000, Eig entered into a settlement agreement with the National Trust and Giddins. The agreement called for Mrs. Colodny's estate to pay $196,000 to the National Trust and for Eig to pay, from his personal funds, $204,000 to the National Trust and $52,000 to establish a new trust for Samuel Giddins.

Thereafter, in April of 2002, Eig filed a breach of contract suit against Pacific in the Circuit Court for Montgomery County. Eig contended that Pacific breached the insurance contract by: (1) refusing to indemnify him for his legal fees in prosecuting the declaratory judgment action in the Probate Court and defending against Elizabeth's countercomplaint in that action; (2) refusing to defend against the claims by the National Trust and Samuel Giddins; and (3) refusing to indemnify him in connection with the settlement agreement.

Both Eig and Pacific filed motions for partial summary judgment and, on April 23, 2003, the court granted partial summary judgment in Eig's favor. It stated:

I do believe there is a duty to defend the plaintiffs under facts which are not in dispute. . . .

Accordingly, I am going to grant plaintiffs' motion for partial summary judgment on the issues of defendants' duty to defend plaintiffs under the policy.

I find that the defendants had a duty to provide the plaintiffs a defense at Pacific's Employer's expense . . . to a suit in the probate division of the superior court of the District of Columbia, and a claim with the National Trust for Historic Preservation.

. . .

I am [also] going to grant plaintiffs' motion for partial summary judgment, . . . entering partial summary judgment for the plaintiffs on the issue of defendants' liability to reimburse plaintiffs for all costs of defense incurred by them, and to make payments on behalf of plaintiffs under the indemnity provisions of the policy without reduction, proration or contribution from other sources or insurance.

One of the last issues is plaintiffs' motion for partial summary judgment on the issue of plaintiffs' right to recovery of attorney's fees in this action.

I think that that is an appropriate motion to grant. So, I will grant the motion for partial summary judgment on the

issue of plaintiffs' right to recover attorney's fees in this case.

The court thus determined, in essence, that Pacific had a duty to defend and indemnify Eig in connection with the declaratory judgment action that he filed, in his capacity as personal representative, in the probate case. It further determined that Pacific had a duty to defend and indemnify Eig in connection with the claims by National Trust and Giddins. The court rejected Pacific's contention that, because Eig held a professional liability policy with Continental Casualty Company ("CNA") for the coverage period of March 1, 1998, to March 1, 1999, Pacific was entitled to reduction, proration, or contribution.

On June 1, 2003, trial was held solely on the issue of damages. In a "Memorandum Opinion" entered on July 31, 2003, the court determined that Eig was entitled to indemnification for the payments made to settle the claims by the National Trust and Giddins; indemnification for attorneys' fees in connection with both the declaratory judgment action and the settlement of the claims by the National Trust and Giddins; and attorneys' fees for the prosecution of the breach of contract claim against Pacific. The court held, however, that Pacific was *not* required to indemnify Eig for the full amount of fees billed by one law firm, McGuireWoods, LLP ("McGuireWoods"), in connection with the declaratory judgment action and the settlement. It expressed the belief that Eig could not be required to pay the firm $141,213.28 of the $341,213.28 in fees incurred. The court thus awarded Eig a total of $754,911.36,[2] consisting of:

— $257,012.15 for settlement payments to the National Trust and to establish a trust for Samuel Giddins,

— $65,635.99 for prejudgment interest,

---

2. The court initially awarded Eig a total of $611,286.07. Upon Eig's motion for reconsideration, the court determined that it had "inadvertently included and neglected to include certain amounts in its calculation," and therefore recalculated the award.

— $208,911.02 for attorneys' fees paid to various law firms, including McGuireWoods, in connection with the declaratory judgment action and the settlement of the claims by the National Trust and Giddins, and

— $223,352.20 for attorneys' fees for the prosecution of the breach of contract claim.

## ISSUES

On appeal to this Court, Pacific argues, in essence, that the trial court erred in granting partial summary judgment in Eig's favor, in that:

I. The trial court erred in determining that the acts or omissions were committed by Eig during the coverage period,

II. The trial court erred in determining that the policy required Pacific to indemnify Eig for counsel fees and costs in connection with the declaratory judgment action,

III. The trial court erred in determining that the policy required Pacific to indemnify Eig for the settlement costs and counsel fees incurred in settling the claims by the National Trust and Giddins, and

IV. The trial court erred in requiring Pacific to pay the full amount of damages, without "reduction, proration, or contribution" from CNA.

In his cross-appeal,[3] Eig argues:

V. The trial court erred in determining that he was not obligated to pay the full amount of attorneys' fees

---

**3.** Eig has moved to strike two unreported opinions which Pacific has cited in its brief and has attached in an appendix. One of the opinions was filed by the United States Court of Appeals for the Fourth Circuit, the other by the United States Court of Appeals for the Ninth Circuit. Neither the courts of this State nor the Courts of Appeals for the Fourth or Ninth Circuits recognize unreported opinions as precedent or persuasive authority. *See* Md. Rule 1–104; Fourth Circuit Local Rule 36(c); Ninth Circuit Rule 36–3. Therefore, we shall grant Eig's motion. We shall not consider the unreported opinions.

billed by McGuireWoods and in therefore refusing to order Pacific to indemnify him for the full amount.

We find merit in Pacific's second argument. We therefore vacate the judgment of the trial court and remand the case to that court for such further proceedings as are necessary to recalculate the award *without* indemnification for the attorneys' fees and costs incurred in the declaratory judgment action, or for the attorneys' fees incurred in the pursuit of those damages.

As to Eig's cross-appeal, we agree that the trial court erred in determining that Eig could not be required to pay $141,213.28 of the McGuireWoods bill. Upon remand, the trial court must determine what portion of McGuireWoods's fees was incurred in connection with the settlement agreement and is therefore subject to indemnification, as opposed to what portion was incurred in connection with the declaratory judgment action and is not subject to indemnification. In doing so, the court must consider that Eig *can* be required to pay, from any funds remaining from his award after he pays all other fees and costs incurred in connection with his claim against Pacific, the amount remaining on McGuireWoods's bill.

## DISCUSSION

### *—PACIFIC'S APPEAL—*

We turn first to Pacific's challenge to the trial court's grant of partial summary judgment in Eig's favor.

"In determining whether a party is entitled to summary judgment, a trial court will not determine any disputed facts, but rather makes a ruling as a matter of law." *Megonnell v. United Services Auto. Assoc.,* 368 Md. 633, 641, 796 A.2d 758 (2002). *See generally* Md. Rule 2–501(e). " '[T]he standard of review for a grant of summary judgment is whether the trial court was legally correct.' " *Megonnell,* 368 Md. at 641–42, 796 A.2d 758 (citation omitted). "The appellate court has the same facts from the record before it and considers the same issues of law as the trial court and is tasked with determining whether the trial court reached the correct result as a matter of law." *Mamsi Life & Health Ins. Co. v. Callaway,* 375 Md.

261, 278, 825 A.2d 995 (2003). "We ordinarily will uphold the grant of summary judgment only on a ground relied on by the trial court." *Id.* at 279, 825 A.2d 995.

"It is well established in Maryland that insurance policies are construed like other contracts." *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566 (1997). "When determining coverage under an insurance policy, 'the primary principle of construction is to apply the terms of the insurance contract itself.'" *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 355 Md. 566, 581, 735 A.2d 1081 (1999) (*Bausch & Lomb II*) (citation omitted). "In doing so, we ascertain the parties' intentions from the policy as a whole." *Id.* "In construing the terms of the insurance contract, unless 'there is an indication that the parties intended to use words in the policy in a technical sense, we accord the words their usual, ordinary, and accepted meaning.'" *Id.* "When the terms of a contract are ambiguous, courts look to extrinsic sources to ascertain the meaning of the terms." *Mamsi Life & Health Ins. Co.*, 375 Md. at 279, 825 A.2d 995. "If the terms are unambiguous, the court may construe the language as a matter of law." *Id.*

" 'The promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums.'" *Litz*, 346 Md. at 225, 695 A.2d 566 (citation omitted). "The duty to defend is broader than the duty to indemnify," *id.*, and "should be construed liberally in favor of the policyholder." *Id.* at 231, 695 A.2d 566. As the Court of Appeals has explained, "an insurer has a duty to defend when there exists a '*potentiality* that the claim could be covered by the policy.'" *Id.* at 225, 695 A.2d 566 (citation omitted) (emphasis in original). "Under the potentiality rule, the insurer will be required to defend more cases than it will be required to indemnify because the mere possibility that the insurer will have to indemnify triggers the duty to defend." *Id.* "The duty to defend exists 'even though "the claim asserted against the insured cannot possibly succeed because either in law or in fact there is no basis for a plaintiff's judgment." ' " *Id.* (citations omitted).

Unlike the law of some states, which construes insurance contracts against the insurer, this Court holds that an insurance contract will be construed against the insurer only when an ambiguity remains after considering the intentions of the parties from the policy as a whole and, if necessary, after admitting and considering any relevant parol evidence.

*Bailer v. Erie Ins. Exchange,* 344 Md. 515, 522, 687 A.2d 1375 (1997).

As with all insurance contracts, the language of a policy's insuring clause is always subject to interpretation. One of the prime inquiries in interpreting a liability insurance policy is: what triggers coverage?

[T]here are two types of Errors and Omissions Policies: the "discovery" [or claims made] policy and the "occurrence" policy. In a discovery policy the coverage is effective if the negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy, no matter when the act occurred. In an occurrence policy the coverage is effective if the negligent or omitted act occurred during the period of the policy, whatever the date of discovery.

*Samuel N. Zarpas, Inc. v. Morrow,* 215 *F.Supp.* 887, 888 (D.N.J.1963).

■ The difference between claims made policies and occurrence policies was contrasted in *Mut. Fire, Marine & Inland Ins. Co. v. Vollmer,* 306 Md. 243, 252, 508 A.2d 130 (1986). "Generally speaking, 'occurrence' policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Conversely, 'claims made' (or 'discovery') policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred."[4] *Id.* *See generally St. Paul Fire & Marine Ins. v. House,* 315 Md. 328, 332–33, 554 A.2d 404 (1989). (" ' "[C]laims made" (or "discovery") policies cover liability inducing events if and when a claim is made during

---

4. Variations on this definitional theme pervade the law. The fundamental distinction between the two types of policies has been expressed

the policy term, irrespective of when the events occurred.'" (citation omitted)).

Under "discovery" policies, the trigger is: when did the injury take place? Such policies are characterized by coverage for acts or omissions only if they are discovered and brought to the attention of the insurer during the policy term. Under "occurrence" policies, the trigger is: when was the claim reported to the carrier? Under this latter type, liability can be extended for an indefinite period beyond the actual policy period unless the retrospective coverage is restricted in some manner by the terms of the policy.

A "discovery" or "claims made" policy differs from an "occurrence" policy in at least one very important aspect: transmittal of the notice of the claim to the insurer, because it triggers coverage, is the most important aspect of the "discovery" policy.

The essence, then, of a "discovery" policy is notice to the carrier within the policy period. Thus, the timing of the making of the claim in such policies is of equal importance with the error or omission. Notice to the insurer of a claim made against the insured generally must be given during the policy period or within a specified amount of time after the policy period.

With this general description of the insurance topography, we begin our peregrination.

## I.

### Acts or Omissions During Coverage Period

Preliminarily, Pacific argues that the "acts" or "omissions" committed by Eig that led to his demands for coverage did not occur during the coverage period.

---

in different terms and with differences in emphasis. As Judge Rodowsky points out for the Court of Appeals in *Mut. Fire, Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 252, 508 A.2d 130 (1986), the Michigan case of *Stine v. Continental Casualty Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984), contains an excellent comparison of occurrence coverage with pure, *i.e.*, nonhybrid, claims made coverage.

As we explained in our recitation of the relevant facts, the Pacific policy became effective on March 1, 1987, and terminated on March 1, 1988. In pertinent part, it provided:

## I. THE COVERAGE

### INSURING AGREEMENT AND CLAIMS MADE CLAUSE

The Company shall pay on behalf of the insured in excess of the deductible all sums which the insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured and reported to the Company during the Policy Period by reasons of any act, omission, or Personal Injury caused by the Insured or any person for whom the insured is legally liable in the rendering or failure to render Professional Services for others.

**PROVIDED ALWAYS THAT** such act, omission or Personal Injury occurs:

(a) during the Policy Period; or

(b) prior to the effective date of the policy, provided no Insured had knowledge of any Claim or act, omission or Personal Injury that might give rise to a claim.

On March 1, 1988, the "Discovery Period Endorsement" became effective. That endorsement stated:

Coverage will be provided according to the applicable terms, conditions and exclusions of this policy for claims first made after the termination of the Policy Period, *arising out of any act, omission or Personal Injury by the Insured in rendering Professional Services for others in the Insured's capacity as an Attorney, which occurred prior to the termination of the Policy Period* and were caused by the Insured[ ] or any other person for whose acts or omissions the Insured is legally responsible, and are otherwise covered by this policy.

(Emphasis added.) The endorsement thus extended coverage to acts or omissions that occurred prior to March 1, 1987, but

were reported later.[5]

The policy here clearly defined the extent of coverage in its insuring clause, which required (1) acts, omissions, or Personal Injury, (2) caused by the insured, (3) prior to the termination of the Policy Period and (4) "for claims first made after the termination of the policy period." Thus, although initially a claims made policy, the endorsement is typical of "occurrence" policies, the policy provided coverage for a specific act or omission, generally ascertainable with some precision as to date and time, that occurred during a particular period, *regardless of when the claim was asserted.* The event that triggers coverage under such a policy is transmittal of notice of the claim to the insurance carrier. In issuing such an endorsement, the carrier must be presumed to have realized that its liability could extend for an indefinite period beyond the actual policy period.

Neither "act" nor "omission" is defined by the policy. By common parlance, however, an "act" is "a thing done," *Webster's Third New International Dictionary* 20 (1981), and an "omission" is "something neglected or left undone." *Id.* at 1574. Liability under a legal malpractice policy, however, is generally limited to *professional acts or omissions* arising out of the vocation. This is made clear by the plain language of the endorsement—such acts or omissions must have been committed "by the Insured in rendering professional services for others in the Insured's capacity as an Attorney," and must have "occurred prior to the termination of the policy period," or prior to March 1, 1988.

---

5. The declaration page of the Pacific policy provided: "**This is a claims made policy.** *Except to such extent as may be provided otherwise herein,* this insurance is limited to liability for only those claims that are first made against the insured during the policy period." (Emphasis added.) In light of the above-quoted "Discovery Period Endorsement," the "claims made" language is inapplicable here.

Because a substantial lapse of time often occurs between the claim and the occurrences in these types of cases, the trail coverage provided by occurrence policies is sometimes referred to as long-tail coverage. For a good explanation of such situations, *see* Allan D. Windt, *Insurance Claims f & Disputes* § 11.05 (3d ed.1999).

What then constituted an "act" or "omission" within the terms of the insurance policy? Was the negligent conduct of Eig an "act," or did the "act" occur when the damage actually resulted? Rephrased, was the "act" the cause of the harm done to Mrs. Colodny, or was it the effects suffered by Mrs. Colodny? Such a probe is essential because it is dispositive of whether or not there will be coverage under this policy. An interpretation of "act" that focuses on the cause of the harm results in coverage for Eig's negligence during the policy period, even though the harm did not occur until long after the policy had lapsed.

 Pacific contends that the only "act" that could have triggered coverage was the execution of the will, and that did not occur until March 10, 1988, nine days after the termination of the policy. Restated, Pacific urges that the determination of when an "occurrence" happens must be made by reference to the time when the injurious effects of the occurrence took place, and that we construe this "occurrence" policy as focusing on the effects of the "act" or "occurrence." This obviously results in more restricted coverage since, by utilization of such an approach, we would consider an "act" or "occurrence" to be the time that the actual harm is suffered—here, appellant urges, is the execution of the will—rather than the time when the initial liability producing "act" or "occurrence" took place.[6] Such an approach thus focuses more on the actual damage than on its cause.

We reject such an approach. From Mrs. Colodny's perspective, March 10, 1988, may well have been a critical date. Assuming Mrs. Colodny was sufficiently unqualified to ascertain the wrong, and thus it was impossible or unreasonable for her to have sufficient notice of the nature and cause of her injury on the date of her execution of the will, whatever cause of action she might have had against Eig would be deemed to have accrued on the date when she knew or, with due dili-

---

6. One might better argue that actual damages were not suffered until the will was actually offered for probate and not at the time of the mere execution of the will.

gence, reasonably should have known of the wrong. *See Doe v. Archdiocese of Washington,* 114 Md.App. 169, 177, 689 A.2d 634 (1997). But Mrs. Colodny was not the insured.

We focus on the "act" or "occurrence" causing the harm that resulted in coverage for Eig's negligence during the policy period, even though the policy had lapsed before the effects of Eig's negligence surfaced. It was Mrs. Colodny, not Eig as the "insured," who executed the will on March 10, 1988, when presented with the defective will for execution by Eig.

Eig presented the trial court with undisputed evidence that he met with Mrs. Colodny several times between August of 1987 and early January of 1988 regarding the second will and the trust. He completed the final draft of the second will on January 13, 1988. He did not revise the draft after that date. Eig delivered the draft to Mrs. Colodny sometime before March 1, 1988. Clearly, the professional "act" or "omission" on Eig's part, which resulted in the defective residuary clause, occurred squarely within the policy period. *Cf. Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969) (wherein a plaintiff client sued a defendant attorney for malpractice in connection with the preparation of a title letter that contained erroneous information, the Court of Appeals explained that the Statute of Limitations began to run when the plaintiff discovered the error and not when *the negligent act of drafting of the letter by the attorney occurred* ).

## II.

### Declaratory Judgment Action

The trial court ruled that the policy required Pacific to indemnify Eig in connection with the declaratory judgment action in the probate case. It ordered Pacific to reimburse Eig for all his attorneys' fees and costs in connection with that action. Pacific argues that, because the declaratory judgment action was brought by Eig in his capacity as personal representative of Mrs. Colodny's estate, and was not an action brought *against* Eig, Pacific was not obliged to provide a

"defense" and cannot properly be required to indemnify Eig. We agree.

The Pacific policy clearly stated that Pacific was required to pay those "damages" that Eig became legally obligated to pay as the result of qualifying "claims" against him. The policy defined "damages" as "any amount which the insured is legally obligated to pay for any Claim to which this Insurance applies and shall include judgments and settlements. . . ." It defined "claim" as "any notice received by the Insured from a person or entity advising that it is the intention of such person or entity to hold the insured responsible for an act [or] omission . . . covered under this Policy."

In addition, the policy provided that Pacific had the duty to "defend" any qualifying "suit" against Eig. It stated that Pacific was required to pay certain expenses, including "claim expenses." Claim expenses were not limited to expenses resulting from suit. They were defined in the policy as, *inter alia*, "fees, costs, and expenses resulting from the investigation, adjustment, [and] defense . . . of a Claim. . . ."

As Pacific correctly points out, the declaratory judgment action was brought by Eig, at the direction of the Probate Court, in his capacity as personal representative of Mildred Colodny's estate. It was neither a claim nor a suit against Eig, and it did not seek damages from Eig or anyone else. The action should indeed have been of interest to Pacific, in that a declaration that the residuary clause was invalid could have—and did—result in covered claims against Eig.

Nevertheless, the plain language of the policy made clear that the declaratory judgment action itself was not a suit or claim that triggered Pacific's duty to defend Eig. This particular proceeding could not have culminated in an award of damages against Eig for which Pacific would have been required to provide indemnification. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1540–41 (11th Cir.1990) (fiduciary responsibility insurer had no duty to pay counsel hired by insured, who was trustee of profit-sharing trust fund, to bring declaratory judgment action against IRS, even

though IRS decision on tax matter had exposed insured to potential liability for breach of fiduciary duty); *3250 Wilshire Boulevard Bldg. v. Employers Ins. of Wausau*, 39 Cal.App.4th 1277, 46 Cal.Rptr.2d 399 (1995) (business liability insurer had no duty to provide legal services for insured landlord's suit against tenant when neither suit nor tenant's defenses could have subjected insured to liability).

■ Nor did the countercomplaint filed by Elizabeth Colodny trigger a duty to defend or indemnify on Pacific's part. With her countercomplaint, Elizabeth sought only to establish that the residuary clause was invalid, and that she was entitled to inherit the entire residuary of her mother's estate. Elizabeth did not assert a claim against, or seek damages from, Eig. *See generally Oler v. Liberty Mut. Ins. Co.*, 297 A.2d 333 (D.C.1972) (malpractice insurer had no duty toward insured physician, who was told by court he must defend petition for appointment of guardian for patient before it would reimburse him for costs of guardianship proceeding, in that the court's requirement did not implicate type of malpractice claim that would have been covered under policy). *Compare Eliopoulos v. Nation's Title Ins. of New York, Inc.*, 912 F.Supp. 28 (N.D.N.Y.1996) (although title insurance company was not required to "defend" insured landowner in action against neighboring landowners to clear clouds on title, it was required to defend and indemnify landowner in countersuit by adjoining landowners who asserted claim to insured's land, unless insurer could establish factually that an exclusion to coverage applied).

## III.

### National Trust and Giddins Settlements

■ Pacific's argument that it had no duty to defend or indemnify Eig in the claims by the National Trust and Giddins is *not* similarly supported by the language of the policy.

There can be no dispute that, when the Probate Court declared the residuary clause to be invalid, the bequests to both the National Trust and Giddins were nullified. Both the

National Trust and Giddins—through his mother—informed Eig that they would hold him responsible for their losses. Clearly, such notification to Eig from the National Trust and Giddins only can be interpreted as some expression of dissatisfaction with his services. Although this dissatisfaction on the parts of the National Trust and Giddins never progressed from "claim" to "suit" against Eig, they certainly asserted "claims" against him within the meaning of the Pacific policy.[7] Pacific denied coverage, however, and Eig independently reached a settlement agreement with the National Trust and Giddins.

As we have indicated, this policy expressly stated that, in addition to defending the insured against suit, it must pay "claim expenses." Such expenses were defined as, *inter alia,* "fees, costs, and expenses resulting from *the investigation, adjustment, [and] defense . . . of a Claim . . . .*" (Emphasis added.) Clearly, the attorneys' fees incurred by Eig in reaching the settlement agreement with the National Trust and Giddins fell within the policy's definition of "claim expenses."

Although the policy suggested that an insured was required to obtain Pacific's consent before incurring "claim expenses," it does not follow that the insured could not obtain indemnification even if Pacific's consent was unreasonably withheld. If that were the case, Pacific could avoid paying all claim expenses simply by refusing to incur them itself or to approve the incurrence of them by the insured.

The policy also established that Pacific was required to pay "all sums which the insured shall become legally obligated to pay as Damages" as a result of eligible claims. Again, the word "damages" was defined to mean "any amount which the insured is legally obligated to pay for any Claim . . . and shall

---

7. Although the word "claim" may be subject to judicial interpretation in certain cases, *see Klein v. Fidelity & Deposit Co. of America,* 117 Md.App. 317, 332, 700 A.2d 262 (1997), in this case it is not. To reiterate, the policy specifically defined "claim" as "any notice received by the Insured from a person or entity advising that it is the intention of such person or entity to hold the Insured responsible for an act [or] omission . . . covered under this Policy."

include judgments *and settlements.*" (Emphasis added.) Eig's settlement with the Historic Trust and Giddins fell within the definition. There is no suggestion that the amount of the settlement was unreasonable.

 Pacific's contention that it was justified in denying coverage on the basis that Eig failed to notify it promptly of the claims is without merit. As previously discussed, this policy was an "occurrence" policy, which required Eig to notify the carrier as soon as he became aware of a professional act or omission that could be the basis of a suit. The policy provided:

### X. CONDITIONS—CLAIMS
### A. NOTICE OF CLAIM

As a condition precedent to the right of protection afforded by this insurance, the insured shall, as soon as practicable, give written notice of any Claim against the insured to the Company's agent or to the Company, c/o INAPRO Division; Attention Claims Manager; P.O. Box 353, 127 John St., New York, N.Y. 10272.

 In accordance with this policy requirement, Eig *did* notify Pacific of the claims prior to the resolution of the declaratory judgment action and in time for Pacific to participate in that action had it so desired. Even assuming *arguendo* that the notice was not timely, moreover, Pacific suffered no conceivable damages from any delay. In Maryland, "[i]n order to avoid its duty to defend or indemnify on the ground of delayed notice, the insurer must establish by a preponderance of affirmative evidence that the delay in giving notice has resulted in actual prejudice to the insurer." *Sherwood Brands, Inc. v. Hartford Accident & Indem. Co.*, 347 Md. 32, 42, 698 A.2d 1078 (1997).

 In addition to indemnification for the settlement amount and his attorneys' fees in reaching the settlement, Eig is entitled to recover his attorneys' fees for the breach of contract action against Pacific for refusing to defend and indemnify him in connection with the claims. In general,

Maryland follows the American rule which "stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for" breach of contract.... Therefore, in the absence of a statute, rule or contract expressly allowing the recovery of attorneys' fees, a prevailing party in a lawsuit may not ordinarily recover attorneys' fees....

There is one nonstatutory exception to the American rule in actions involving insurance policies. Where an action is brought to enforce an insurer's obligations under the third party liability provision of a policy, and it is determined that there is coverage under the policy, the insurer is liable for the prevailing party's attorneys' fees....

*Bausch & Lomb II,* 355 Md. at 590–91, 735 A.2d 1081. *See also Megonnell,* 368 Md. at 660, 796 A.2d 758.

## IV.

### Other Insurance

■ Finally, Pacific argues that the trial court erred in determining that Pacific was obligated to pay Eig's damages "without reduction, proration or contribution" from another insurer, CNA.

Pacific reiterates its position that the claims by the National Trust and Giddins were not covered by its policy because the act or omission that led to the claims—in Pacific's view, the execution of the will—occurred after the termination of the policy period. Pacific points out that Eig had a "claims made" policy with CNA for the coverage period of March 1, 1998, to March 1, 1999, and argues that the CNA policy fully covered the claims. In the alternative, Pacific posits that, even if it is liable to Eig, it is liable for only a *pro rata* share of the damages.

As we explained in Part I of our discussion, the professional acts or omissions by Eig that led to the claims by the National Trust and Giddins occurred within the coverage period of the Pacific policy. There is no longer any question that Pacific is liable at least to some extent to Eig. The trial court rejected

Pacific's contention that it is responsible for only a *pro rata* share of the damages because Eig was covered by the CNA policy as well as the Pacific policy. We have reviewed the insurance contracts in question and conclude that the trial court "reached the correct result as a matter of law." *Mamsi Life & Health Ins. Co.*, 375 Md. at 278, 825 A.2d 995.

For purposes of this discussion, we assume without deciding that the CNA policy was valid and would have covered the relevant claims had the requirements of the policy been met. We express no opinion as to the interpretation or validity of any portion of the CNA policy, except that provision which is necessary to our resolution of the issue at hand. CNA, of course, was not a party to the proceedings below and is not a party to this appeal.

The pertinent provision of the Pacific policy set forth the following:

### B. OTHER INSURANCE

If the Insured has other valid and collectible insurance against Damages covered by this policy the Company shall not be liable under this policy for a greater proportion of such Damages and Claims Expenses than the applicable limit of liability stated in the Declarations bears to the total applicable limit of all valid and collectible insurance for such Damages....

The pertinent provision of the CNA policy provided, in turn:

G. Other insurance

If there is other insurance that applies to the claim:

1. On a claims made basis,[8] this insurance shall be excess over such other valid and collectible insurance whether such insurance is stated to be primary, contributory, excess, contingent or otherwise.

----

8. Because CNA is not a party to these proceedings and we have previously found that the Pacific policy was an occurrence policy as a result of the endorsement, we need not address the question of whether this provision of the CNA policy is excess only over other claims made insurance.

For the purpose of our discussion, we will assume the provision was an "excess 'other insurance' clause," intended to make "an otherwise primary policy excess insurance should another primary policy cover the loss in question." 15 Lee R. Russ, *Couch on Insurance* § 219:33 at 219–36 (3d ed.1999).

The limit of the Pacific policy was $1,000,000. The limit of the CNA policy was $5,000,000. Based on this, Pacific apparently believes it can be required to indemnify Eig for only 20 percent of the damages. Pacific tacitly assumes that its "other insurance" clause, which limits its liability to the proportion its policy limit bears to the policy limit of other "valid and collectible" insurance, applies even when the other insurance provides only excess coverage. That would mean that excess coverage would be required once Pacific paid its *pro rata* share, not once Pacific's policy limit was reached.

True excess liability insurance "covers occurrences covered by the primary policy but exceeding the liability limits of the primary policy." *Megonnell*, 368 Md. at 644 n. 5, 796 A.2d 758. Even when the insurance policy is a primary policy that becomes an excess policy by virtue of an excess "other insurance" clause, the insurer will not be required to provide coverage until the policy limit of the other insurance is reached. As one commentator explains:

A typical excess "other insurance" clause reads—

"This insurance shall apply only as excess insurance over any other valid and collectible insurance which would apply in the absence of this policy, except insurance written specifically to cover as excess over the limits of liability applicable to ... this policy."

Such clauses are generally regarded as valid....

Where one policy has an excess other insurance clause and another policy on the same risk does not, the former policy will not come into effect until such time as the limits of the latter policy are exhausted....

*Couch on Insurance,* § 219:33 at 129–36—129–37 (footnotes omitted).

There was no material difference between the excess "other insurance" clause in the CNA policy and the "typical excess 'other insurance' clause" examined in *Couch.* We interpret the clause in a like manner and conclude that CNA could not be required to provide coverage until the $1,000,000 limit of the Pacific policy had been exhausted. Because Eig demanded less than $1,000,000 in his complaint against Pacific, the trial court properly determined by summary judgment that Pacific was not entitled to "reduction, proration or contribution" from CNA.[9]

### —EIG'S CROSS-APPEAL—

### V.

### Attorneys' Fees

In his cross-appeal, Eig argues that the trial court failed to reimburse him fully for his attorneys' fees. Specifically, Eig points out that he was billed $341,213.28 by the law firm of McGuireWoods, LLP, for work it performed in connection with the declaratory judgment and settlement, but that the court's award reimbursed him for only $200,000 of that amount. Eig contends that the court based the award on the mistaken belief that Eig would never have to pay $141,213.28 of the McGuireWoods bill.

In the "Memorandum Opinion" issued after the trial as to damages, the trial court stated:

[T]here is no dispute that the Plaintiffs are not obligated to pay any more in attorney fees to Maguire, Woods. It was

---

9. As an alternative basis for finding Pacific liable in full, Eig suggests that he was not covered by the CNA policy in light of a clause stating that a qualifying claim would be covered "provided that ... the Insured did not give notice to a prior insurer of such claim or a related claim." Eig reasons that, because he gave notice of the claim to both Pacific and CNA, CNA was not required to cover the claim. While we question whether such a policy provision could be enforced by CNA, we need not resolve the matter at this juncture. Assuming *arguendo* that the provision was invalid, we nevertheless determine that, in light of the excess "other insurance" clause discussed herein, CNA incurred no liability.

conceded that the Plaintiffs were under no obligation to pursue further recovery and could have dropped the claim for this portion of the recovery at any time.... The plain and simple truth is that there is no obligation to pay further and recovery for this portion of attorney fees must be limited to $200,000.00.

To the contrary, Eig entered into evidence a letter addressed to him from McGuireWoods, which, Eig confirmed, represented a settlement agreement as to the attorneys' fees owed by Eig. The letter stated, in pertinent part:

1. payments to McGuireWoods, LLP will include the following:

a. immediate payment of $100,000;

b. additional payment of $100,000 on or before December 1, 2000;

c. any net recovery from the claim you will pursue against your insurance carrier will be paid to McGuireWoods, LLP (up to the amount of the outstanding balance of the fees); "net recovery" means any funds remaining after the payment of all legal and other fees and costs incurred by you in the pursuit of this claim (including our fees and costs in connection with the insurance matter);

2. you reserve the right to determine how to proceed in connection with that insurance claim and whether, when, and on what terms to settle or abandon the claim....

As in the case of the insurance policies, the interpretation of Eig's agreement with McGuireWoods regarding attorneys' fees "is a question of law, subject to *de novo* review" by this Court. *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540 (2003). In interpreting the agreement, "we accord the words their usual, ordinary, and accepted meaning." *Bausch & Lomb v. Utica Mut. Ins. (Bausch & Lomb I)*, 330 Md. 758, 779, 625 A.2d 1021 (1993). "A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to them." *Id.*

The agreement between Eig and McGuireWoods made clear that Eig was to pay the law firm the remaining fees out of any net recovery. Net recovery was specifically defined as "any funds remaining after the payment of all legal and other fees and.costs incurred by you in the pursuit of this claim," with "this claim" clearly referring to the claim against Pacific. That is, Eig was to pay McGuireWoods the outstanding $141,213.28 from that portion of the recovery remaining after he paid all costs and fees *in connection with the suit against Pacific.* By the express terms of the agreement with McGuireWoods, Eig could be required to pay the outstanding bill from funds that the court specifically earmarked as funds to reimburse Eig for:

—the settlement with the National Trust and Samuel Giddins;

—prejudgment interest;

—and attorneys' fees paid to law firms other than McGuireWoods.

The mere fact that the agreement provided that if Eig did not pursue an action against Pacific he would not be required to pay the outstanding fees does not suggest that Eig would not be required to pay McGuireWoods in the event that he *did* pursue an action and recover an award. In making the agreement, both Eig and McGuireWoods recognized that Eig might have difficulty financing the litigation against Pacific, and that if Eig were forced to abandon that litigation without recovery he would have no funds with which to pay the outstanding fees. The agreement—to which Pacific was not a party—simply had no bearing on Pacific's obligations under the policy.

We again caution the trial court that, on remand, Eig will not be entitled to reimbursement for those fees paid to McGuireWoods or any other law firms in connection with the declaratory judgment action. The total amount of McGuireWoods's fees for which Eig can be reimbursed must be recalculated accordingly.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED IN PART AND RE-VERSED IN PART. CASE REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS IN ACCOR-DANCE WITH THIS OPINION.

COSTS TO BE PAID 4/5 BY APPELLANT/CROSS–APPELLEE AND 1/5 BY APPELLEE/CROSS–APPEL-LANT.