508 A.2d 130

The MUTUAL FIRE, MARINE & INLAND
INSURANCE COMPANY

v.

Frederick J. VOLLMER.

Misc. No. 28, Sept. Term, 1985.

Court of Appeals of Maryland.

May 8, 1986.

Motion for Reconsideration Denied June 26, 1986.

George F. Pappas and Jack L.B. Gohn (Melnicove, Kaufman, Weiner & Smouse, P.A., on brief), Baltimore, for appellant.

Thomas B. Wheeler (Patrick A. O'Doherty, on brief), Baltimore, for appellee.

Argued before SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

The Mutual Fire, Marine & Inland Insurance Company (FM & I) is suing its insured, Frederick J. Vollmer, M.D. (Vollmer), in the United States District Court for the District of Maryland seeking reimbursement of monies paid by FM & I in settlement and defense of a medical malpractice claim brought against Vollmer. FM & I maintains that its policy does not cover the underlying claim which it defended under a reservation of rights. The federal court has certified the following questions to us:

1. Whether allegations of omissions after the date of last consultation are sufficient to allege malpractice for purposes of insurance coverage.

2. Whether, assuming a judicial determination that there was no insurance coverage, an insurer which has defended its insured under a valid reservation of rights, and settled with the consent of the insured, is entitled to indemnification for the costs of settlement <u>and</u> the defense costs. (Underlining in original.[1])

We answer the first question "Yes," as to the particular policy involved here. Consequently, we do not reach the second question.

FM & I issued a medical malpractice liability policy to Vollmer for the policy period August 1, 1977, to August 1, 1978. The coverage is written on a claims made basis, limited by a "retroactive date" of August 1, 1975. That date is critical to the insurer's position which we shall explain after setting forth the facts.

The underlying malpractice suit was filed on March 6, 1978, in the Eighth Judicial Circuit of Maryland. The patient, Patricia A. Keidel, died on May 19, 1978, from metastasized lung cancer leaving her husband and two children surviving. Their amended declaration, asserting an estate and wrongful death actions, claimed against Vollmer, certain radiologists, and a hospital. The theory of Vollmer's liability was that, as the result of an x-ray report which he received following a consultation between himself and Mrs. Keidel on July 26, 1975, Vollmer should have ordered follow-up studies which would have revealed the patient's lung cancer at a time when it would have been operable.

Specifically, the declaration alleges in relevant part that Vollmer

> sent [Mrs. Keidel] directly from his office to the Defendant Hospital with a slip of paper requesting a chest x-ray. . . .

---

1. The certification is made pursuant to the Maryland Uniform Certification of Questions of Law Act, Md.Code (1974, 1984 Repl.Vol.), §§ 12–601 to –609 of the Courts and Judicial Proceedings Article.

On the aforesaid date, July 26, 1975, a chest x-ray was taken by the Defendant radiologists ... which revealed a 5-centimeter lesion in the right lower lobe of [Mrs. Keidel's] lung. This condition compelled a diagnosis of possible malignancy in this small segment of the right lower lobe. At the time the x-ray was taken, the small lesion in [Mrs. Keidel's] right lower lobe was confined to a 5-centimeter area and was operable. At the time the x-ray was taken on July 26, 1975, there had been no spread of this malignancy. The condition revealed on the chest x-ray was fully diagnosable as a probable adenoid cystic carcioma (also known as cylindroma). Standards of care which prevailed in the diagnosis and treatment of such a condition demanded additional radiological studies and prompt removal of the lesion after follow-up studies....

. Contrary to the usual standards of medical, radiological and hospital care exercised by the medical and hospital community in the United States, [Mrs. Keidel] was not advised of this condition. Instead, [Mrs. Keidel] was negligently advised that she was suffering from pneumonitis, a transitory inflammation of the lung. [Mrs. Keidel] was advised by the Defendant Vollmer to rest and no medication was prescribed.

At no time did these Defendants or any of their agents advise [Mrs. Keidel] that she was suffering from a small area of malignancy of the right lower lobe of her lung. At no time did these Defendants or their agents recommend to [Mrs. Keidel] that she receive follow-up studies regarding the suspected lesion of her right lung. Instead, [Mrs. Keidel] was negligently caused to believe that if her symptoms disappeared, then her condition was normal and required no further studies.

It is recited that from July 26, 1975 until December of 1976, [Mrs. Keidel] was negligently permitted by these Defendants to pursue a normal active life without any medical, radiological or hospital supervision to monitor the condition of the right lower lobe of her lung and to

prevent what started as a local malignancy from spreading and involving vital organs.

The statement of facts which accompanies the federal court's certification advises that on July 28, 1975, the radiologists' report was read to Vollmer over the telephone. Thereafter, but before August 1, 1975, Vollmer, relying on the oral report, told Mrs. Keidel that she had pneumonitis, the "walking pneumonia." He told her there was no helpful medication, to rest, and to contact him if her symptoms did not resolve themselves. The written x-ray report, identical in its terms to that read to him, arrived at Vollmer's offices on Tuesday, July 29, 1975.

Mrs. Keidel never sought Vollmer's advice concerning her lung, and Vollmer never prescribed further tests or medication or in any way communicated with her regarding her lung, until December of 1976, by which time the cancer was allegedly inoperable. Expert testimony in the malpractice case indicated that, in addition to the alleged initial misdiagnosis, Vollmer should have ordered Mrs. Keidel to return for a follow-up examination which should have been conducted, in the language of the federal court's certification order, "at some unspecified time beyond the July 26, 1975 visit."

The medical malpractice case was settled with Vollmer's consent.

FM & I's policy, both on the declarations page and in an introduction to the body of the policy, contains the following legend:

Claims Made Policy: Except to such extent as may be provided otherwise herein, this policy is limited to liability for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE. Please review the policy carefully. [Capitals in original.]

The declarations state that the limit of liability is $1,000,000 for each claim and for all claims during the policy period in the aggregate. The policy period is August 1, 1977, to

August 1, 1978, and the "retroactive date" is August 1, 1975. As to the latter, the declarations advise: "(For effect, see Claims Made Clause in THE COVERAGE section of this policy)."

Under the policy's section headed, "THE COVERAGE," the insurer agrees

> [t]o pay on behalf of the Insured all sums that the Insured shall become legally obligated to pay as damages arising out of: ... personal injury caused by error, omission or negligence in professional services rendered or which should have been rendered by the Insured ... arising out of the Insured's profession as a medical practitioner ... (hereinafter referred to as malpractice).
>
> ....
>
> The Company shall have no liability or duty to defend hereunder for malpractice committed or alleged to have been committed prior to the retroactive date specified in the Declarations.
>
> ....
>
> Claims Made Clause: This policy applies to CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD arising out of malpractice committed *or alleged to have been committed* subsequent to the retroactive date set forth in the Declarations. [Italics added.]

FM & I asserts that any malpractice, in order to be covered, had to have occurred on or after August 1, 1975, but that Vollmer's malpractice occurred before that date. This conclusion is based on the proposition which FM & I would have us adopt as a matter of Maryland law, namely, that there can be no medical malpractice after the date of last consultation. The position advanced by FM & I is that treatment ceases after the date of last consultation and that malpractice cannot occur outside of the context of treatment.

FM & I undertakes to demonstrate the validity of its proposition by reference principally to decisions concerning

statute of limitations issues in medical malpractice cases.[2] In general these decisions represent a corollary to the continuing treatment rule which we described in *Hill v. Fitzgerald*, 304 Md. 689, 698, 501 A.2d 27, 31 (1985) as operating in the following fashion:

> "[I]f the treatment by the doctor is a continuing course and the patient's disease or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the medical [practitioner] for the particular disease or condition involved has terminated, unless during the course of treatment the patient learns or should reasonably have learned of the harm, in which case the statute runs from the time of knowledge, actual or constructive." [Quoting *Waldman v. Rohrbaugh*, 241 Md. 137, 140–41, 215 A.2d 825, 827 (1966).]

Where the running of the statute of limitations is triggered by accrual of the cause of action, even if then undiscovered, the continuing course of treatment rule tends to enlarge the time within which suit may be timely filed. A necessary companion to the continuous treatment rule is that accrual is not further postponed into the period of time following the date of last treatment. From cases which in the above context reject a continuing duty to treat and which thereby reject deferral of accrual beyond the last consultation, FM & I concludes that Vollmer could not, as a matter of law, have committed malpractice after July 28, 1975, when he last consulted with Mrs. Keidel.

The argument advanced by FM & I is irrelevant to the issue before us. We are concerned with the allegations of malpractice only for purposes of insurance coverage under the subject policy. From that standpoint it is immaterial whether, as a matter of substantive tort law or for limita-

---

**2.** The cases principally relied upon by FM & I are: *Schmit v. Esser*, 183 Minn. 354, 236 N.W. 622 (1931); *Fleishman v. Richardson-Merrell Inc.*, 94 N.J.Super. 90, 226 A.2d 843 (1967); *Bixler v. Bowman*, 94 Wash.2d 146, 614 P.2d 1290 (1980).

tions purposes, the allegations in the underlying suit pinpoint negligence of Vollmer to July 28, 1975. We deal rather with contract law. The concern here is with the interpretation of the policy which FM & I issued to Vollmer. Consequently we intimate no opinion on when, in the contemplation of the law, the alleged tort was committed.

 Unless a statute, regulation, or public policy would be violated, the first principle of construction of insurance policies in Maryland is to apply the terms of the contract. *See Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). Applying the terms of the subject policy to the facts of this case results in coverage. Vollmer, as insured, became legally obligated to pay damages for malpractice, as defined in the policy, when the underlying case was settled with his consent. By its policy FM & I agreed to pay on behalf of Vollmer all such damages up to the policy limit with certain qualifications. The qualification relied upon by FM & I here is the claims made clause. It is undisputed that the underlying claim was first made against Vollmer during the policy period. That claim so made arose out of malpractice "alleged to have been committed subsequent to" August 1, 1975. The declaration in the malpractice suit alleges that Vollmer failed to perform follow-up studies and alleges that from July 26, 1975, until December of 1976 he negligently permitted Mrs. Keidel to lead a normal life without medical, radiological or hospital supervision to monitor her condition and to prevent the spread of the malignancy. Those are allegations of malpractice. Whether they are legally sufficient allegations of malpractice is not a material consideration under this policy as written. As written, the policy specifies alternative methods for determining whether a malpractice claim made against the insured during the policy period arises out of malpractice subsequent to the retroactive date. The claims made clause is satisfied if the claim made during the policy period arises out of (1) "malpractice committed ... subsequent to" August 1, 1975, or

(2) "malpractice ... alleged to have been committed subsequent to" August 1, 1975.

■ The policy also contains an exclusion, quoted in full above, for malpractice "committed or alleged to have been committed prior to the retroactive date...." Although FM & I does not rest its argument directly on this exclusion, the argument would be that any malpractice, as a matter of law, occurred prior to the retroactive date. Alternatively the clause excludes malpractice "alleged" to have been committed prior to the retroactive date. The declaration against Vollmer alleged malpractice beginning in late July 1975, with the alleged failure continuing into December of 1976. Thus, applying the claims made clause would result in coverage while the exclusion would result in no coverage. The policy is silent on its application where malpractice is alleged to have been committed both before and after the retroactive date. Consequently the rule applicable here is to resolve ambiguity against the drafter of the policy and in favor of coverage. *See St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 198–99, 438 A.2d 282, 288 (1981); *C & H Plumbing & Heating, Inc. v. Employers Mutual Casualty Co.*, 264 Md. 510, 512, 287 A.2d 238, 239 (1972); *Government Employees Insurance Co. v. De-James*, 256 Md. 717, 720, 261 A.2d 747, 749 (1970); *Josey v. Allstate Insurance Co.*, 252 Md. 274, 279, 250 A.2d 256, 259 (1969); *Mateer v. Reliance Insurance Co.*, 247 Md. 643, 648, 233 A.2d 797, 800 (1967).

■ In essence FM & I asks this Court to limit the coverage alternative for alleged malpractice to malpractice which has been alleged in a legally sufficient manner. There are short and long reasons why this policy should not be so interpreted.

The shortest reason is that the policy does not expressly limit the allegations of malpractice to legally sufficient ones.

Another short reason is that the policy is to be read as a whole. *See Pacific Indemnity Co., supra.* In the policy's

coverage section, under a subsection headed "Defense, Settlement [and] Supplementary Payments," FM & I agreed that, "[w]ith respect to the coverage afforded by this Insurance, the Company shall defend any claim or suit in the name of and on behalf of the Insured and pay the costs and expenses incurred in such defense. . . ." If coverage is limited to allegations of malpractice which are legally sufficient, then the insurer has no obligation to defend against legally insufficient claims, even to the extent of moving to dismiss for failure to state a claim. That is an absurd construction.

The long answer is based on our conclusion that the restriction sought to be implied by FM & I is inconsistent with the type of claims made coverage which FM & I wrote for Vollmer. That answer takes us into the nature of claims made coverage.

A claims made policy is to be contrasted with an occurrence policy.

> Generally speaking, "occurrence" policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Conversely, "claims made" (or "discovery") policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. There are, of course, hybrids of the two varieties. [Parker, *The Untimely Demise of the "Claims Made" Insurance Form? A Critique of Stine v. Continental Casualty Company*, 1983 Det.C.L.Rev. 25, 27–28 (footnotes omitted).]

The author of the above article directed his critique at a decision of the Michigan intermediate appellate court which was later reversed by the Supreme Court of Michigan in *Stine v. Continental Casualty Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984). The latter opinion contains an excellent comparison of occurrence coverage with pure, *i.e.*, nonhybrid, claims made coverage.

There is greater public familiarity with the "occurrence" type of policy than with the "claims made" type, largely because automobile insurance liability policies are "occurrence" policies, although other perils are covered in such policies as well. Coverage in an "occurrence" policy is provided no matter when the claim is made, subject, of course, to contractual and statutory notice and limitations of actions provisions, providing the act complained of occurred during the policy period. Because the insurer's liability in such policies ordinarily relates to a definite, easily identifiable and notorious event such as an automobile accident, a fire, a slip and fall injury, or a ship collision, the insurer is ordinarily able to conduct a prompt investigation of the incident and make an early assessment of related injuries and damages with the result that actuarial considerations permit relative certainty in estimating loss ratios, establishing reserves, and fixing premium rates.

*"Claims made", or "discovery" policies, on the other hand, are of relatively recent origin and were developed primarily to deal with situations in which the error, omission, or negligent act is difficult to pinpoint and may have occurred over an extended period of time.*[3] In the case of a "claims made" policy written to cover professional liability, the error or omission may be a discrete act or failure to act, or it may consist of a lengthy process and remain latent and undiscoverable for a number of years. Examples include a physician's misdiagnosis, an attorney's fraudulent concealment, or an architect's defective design. From an underwriting perspective, occurrence policies are unrealistic for such risks because of the long or open "tail" exposure which results. When the "event" intended to be covered cannot easily be fixed and the liability for the consequent injury extends long into the future, often well after expiration of the policy, considerations of inflation, upward spiraling jury awards, and legislative and judicial adoption of newly developing concepts of tort law mean that actuarial

factors, including fixing premium rates and establishing adequate reserves, are highly speculative. The result, logically, is the establishment of a premium rate schedule sufficiently high to accommodate "worst scenario" jury verdicts returned years after the error, omission, or negligent act.

"Claims made" policies meet such difficulties by enabling the insurer to underwrite the risk, compute the premiums, and establish reserves with greater accuracy, safe in the assumption that liability will be limited to claims actually made during the term of the policy for which the premium is computed. When the policy term expires, the insurer knows exactly what its exposure is, at least in terms of the nature and number of "claims made". As a result, the insurer is better able to predict the limits of its exposure and more accurately estimate the premium rate schedule necessary to accommodate the risk undertaken.

There are corresponding, if not always comparable, benefits to the insured in purchasing a claims made policy. Since the insurer can limit the duration of its exposure to the term of the policy currently in force, the more precise actuarial data available enable it to charge a lower premium than would be necessary for an occurrence policy. Another advantage to the insured is the ability, if desired, to purchase insurance which will cover acts or omissions during a period prior to the inception of the policy, providing only that any claim is made during the policy period and any extensions thereof. Claims made policies are also useful to the professional person to provide excess coverage in addition to "occurrence" policy coverage purchased much earlier, the maximum limits of which are now unrealistically low for the reasons stated, and therefore may now be inadequate. [*Id.* at 98–100, 349 N.W.2d at 131–32 (emphasis added).]

Footnote 3 to the *Stine* opinion reinforces the point by saying:

We are advised by the parties that in the relatively new area of asbestos and other environmental contamination litigation, for example, because of the near impossibility of identifying the time of the tortious "occurrence," and the effect of long-term exposure upon the character of the injury, "claims made" insurance coverage is the type ordinarily written. [*Id.* at 99, 349 N.W.2d at 131.]

Similarly, the Supreme Court of New Jersey, in *Zuckerman v. National Union Fire Insurance Co.*, 100 N.J. 304, 312, 495 A.2d 395, 399 (1985), has observed that

[a]n additional shortcoming associated with the use of "occurrence" policies for perils that can cause latent injuries over an extended period of time is the difficulty in determining precisely when the essential causal event occurred. This is particularly true in products liability, professional malpractice, and environmental litigation.

Kroll, *"Claims Made"—Industry's Alternative: "Pay As You Go" Products Liability Insurance*, 637 Ins.L.J. 63, 65 (1976) expresses the same concept.

The "occurrence" policy, as initially conceived by insurers, contemplated that an act of wrongdoing and the consequence thereof were immediate, that is, that damage or injury could be fixed precisely at a particular point in time. That assumption, however, proved to be misplaced with respect to the activities of professionals. For example, if a claim is made against a physician asserting a failure to properly treat a patient over a period of five years, the questions presented as to date of "occurrence" often became so complex as to require significant energies on the part of both the assured and the insurers in seeking to resolve questions of coverage. In such a situation, coverage questions were raised by the various insurers, each of whose policies might have a different limit of liability, different "consent to settle" clauses, and other diverse provisions.

And *see* Kroll, *The Professional Liability Policy "Claims Made,"* 13 Forum 842 (1978); Parker, *supra*, 1983 Det.C.L. Rev., at 31–32.

A claims made professional liability policy may be written to cover all claims made within the policy period no matter when the act or omission giving rise to the liability claim is deemed to have occurred. *See, e.g.,* the policy involved in *Gereboff v. Home Indemnity Co.,* 119 R.I. 814, 383 A.2d 1024 (1978). At the other end of the claims made spectrum is the type of policy involved in *Stine v. Continental Casualty Co., supra,* 419 Mich. at 94, 349 N.W.2d at 129, which provided that the act or omission on which a claim was made in the policy period also had to have occurred after the effective date of the first year of the policy so that, at least in that first year, the policy was not retroactive.

The FM & I policy involved here is between those two extremes. When it became effective on August 1, 1977, it was retroactive to August 1, 1975. To determine coverage it thus becomes necessary not only to look at the date when the claim was made, but also to determine if the retroactive date requirement has been satisfied. Under this policy, satisfaction of that element is not based exclusively on pinpointing the time of an occurrence, that is, on pinpointing when malpractice, in fact and in law, was committed. Consistent with the "claims made" approach of facilitating the determination of coverage questions, this policy also covers if the claim made *alleges* that malpractice was committed after the retroactive date. Whether or not that allegation would be legally correct if the same act or omission had to be placed in time to determine coverage under an occurrence policy is not the issue before us.

Because the alternative phraseology of this policy's retroactive date element is satisfied in the present case, the answer to the first question is "Yes."

CERTIFIED QUESTION ANSWERED AS ABOVE SET FORTH. COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.