**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 03-2100

———————

PATRICIA BALL,

Plaintiff - Appellant,

versus

NCRIC, INCORPORATED, a/k/a National Capital
Reciprocal Insurance Company,

Defendant - Appellee.

———————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Alexander Williams, Jr, District Judge.
(CA-00-832-AW)

———————

Argued: October 29, 2004          Decided: January 27, 2005

———————

Before WILKINS, Chief Judge, and TRAXLER and GREGORY, Circuit
Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Gregory Charles Mitchell, Washington, D.C., for Appellant.
Lee Thomas Ellis, Jr., BAKER & HOSTETLER, L.L.P., Washington, D.C.,
for Appellee. **ON BRIEF:** Stephen C. Leckar, BUTERA & ANDREWS,
Washington, D.C., for Appellant. Amy M. Henson, BAKER & HOSTETLER,
L.L.P., Washington, D.C., for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

Patricia Ball brought this action against NCRIC, Incorporated, seeking satisfaction of a judgment she obtained against a doctor insured by NCRIC. The district court granted summary judgment in favor of NCRIC, and Ball appeals. We affirm.

I.

From April to November 1987, Dr. George Daniel provided in-home treatment to Ball for migraine headaches and depression. During these visits, Daniel injected Ball with various drugs to which Ball became addicted. The drugs put Ball into a state of stupor, during which time Daniel sexually assaulted her. Daniel was arrested in November 1987 on unrelated federal charges of selling prescriptions to undercover agents. Daniel agreed to plead guilty to the charges in February 1988. Daniel, however, did not appear for the plea proceeding, and he remained a fugitive until 1991.

Daniel was insured under a "claims made" medical malpractice insurance policy issued by NCRIC that was in effect from March 19, 1987, until January 1, 1988. Ball brought a malpractice action against Daniel, notifying NCRIC of her claim against Daniel in December 1987. Her action was largely stalled during the time that Daniel remained a fugitive.

2

In April 1992, Ball filed a notice of claim against Daniel with the Maryland Health Claims Arbitration Office, in accordance with Maryland law governing medical malpractice claims. Ball served Daniel (then in federal prison) with notice of her claim and also provided NCRIC with a copy of the arbitration claim. NCRIC took the position that Ball's claims against Daniel did not fall within the scope of the policy issued by NCRIC. In February 1996, the Health Claims Arbitration panel rendered a decision in favor of Ball on her claims against Daniel and awarded $310,000 in damages. Final judgment in that amount was entered in Maryland state court on September 1996.

In February 2000, Ball filed an action in Maryland state court seeking to recover the amount of the judgment through the insurance policy issued by NCRIC. See Washington Metro. Area Transit Auth. v. Queen, 597 A.2d 423, 425-26 (Md. 1991) ("[A] tort claimant may not maintain a direct action against the defendant tortfeasor's liability insurer until there has been a determination of the insured's liability in the tort action. Once there is a verdict or judgment in the tort action, a direct action may be maintained against the liability insurer."). NCRIC removed the case to federal court on the basis of diversity of citizenship.

After cross-motions for summary judgment, the district court ruled in favor of NCRIC, concluding that Daniel's failure to cooperate with NCRIC's investigation of Ball's claim relieved NCRIC

3

of any obligation under its policy. Ball appealed, and this court reversed and remanded. We concluded that NCRIC failed to prove that it was prejudiced by Daniel's lack of cooperation and that section 19-110 of the Maryland Insurance Code therefore prevented NCRIC from denying coverage because of Daniel's lack of cooperation. We also rejected NCRIC's alternative argument that coverage could be denied on the basis of Daniel's failure to notify NCRIC of Ball's claim, as required by the policy. We concluded that because Ball's attorney notified NCRIC of the claim, NCRIC was not prejudiced by Daniel's failure to give notice, and section 19-110 therefore prevented NCRIC from denying coverage on that basis. See Ball v. NCRIC, Inc., No. 01-1716, 2002 WL 1473355, at *2-3 (4th Cir. July 10, 2002) (unpublished).

After the case was remanded to the district court, the parties again filed cross-motions for summary judgment. The district court granted summary judgment in favor of NCRIC on several alternate grounds. The district court concluded that the notice of the claim provided by Ball's attorney to NCRIC did not comply with the requirements of the policy and was therefore insufficient. The district court also concluded that Daniel's actions did not involve the provision of "professional medical services" as covered by the policy. Finally, the district court concluded that Daniel knew or should have known about Ball's potential claim against him when the

4

policy was issued, and that Ball's claim therefore fell within a policy exclusion.

## II.

### A.

NCRIC's policy requires that the insurer be given written notice of any claims made against the insured, and the policy specifies that the notice contain "particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses." Ball's attorney notified NCRIC of her claim against Daniel by letter dated December 15, 1987. Because the letter did not satisfy all of the policy requirements, the district court concluded that NCRIC could deny coverage on that basis.

On appeal, NCRIC recognizes that our decision in the prior appeal precludes any argument that the insufficient notice caused it to suffer "actual prejudice" within the meaning of section 19-110. NCRIC, however, contends that the sufficiency-of-the-notice question is simply a question of contract law that is unaffected by section 19-110. That is, NCRIC contends that if the notice provided by Ball's attorney did not meet the requirements set forth in the policy, then it is entitled as a contractual matter to

disclaim coverage, whether or not it suffered prejudice under section 19-110. We disagree.

Section 19-110 states:

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Md. Code Ann. Ins. § 19-110 (emphasis added). The statute thus applies to a claim that an insured breached the policy by failing to provide the "required notice," which is precisely the claim NCRIC is making when it argues that Ball's notice did not satisfy the requirements of the policy.

NCRIC's claim regarding the sufficiency of the notice thus falls within the scope of section 19-110 and is precluded by our conclusion in the prior appeal that NCRIC failed to establish actual prejudice. The district court erred by granting summary judgment to NCRIC on that basis.

B.

The policy at issue insured Daniel against claims "caused by a medical incident which occurs . . . in the practice of the insured's profession as a physician or surgeon." J.A. 71. The policy defines "medical incident" as "any act or omission in the furnishing of professional medical services to any person." J.A. 75. "Professional medical services" is not defined by the policy.

6

The district court noted that "the scope of professional services does not include all forms of Dr. Daniel's conduct simply because he is a doctor." J.A. 660 (emphasis omitted). The court concluded that Daniel's actions with regard to Ball "were solely for the satisfaction of his own prurient interests," and that his actions "in no way involved the application of any specialized learning or skills." J.A. 660 (internal quotation marks and alteration omitted). The court concluded that Ball's claims against Daniel did not spring from Daniel's furnishing of medical services to Ball and that NCRIC therefore had no duty to cover the judgment entered against Daniel.

There are no Maryland cases interpreting the precise language used in NCRIC's policy. When making their arguments, however, the parties rely on cases involving Maryland's Health Care Malpractice Claims Arbitration Act. In general, the Act requires that claims "against a health care provider for medical injury" must be submitted to arbitration conducted through the Health Claims Arbitration Office before an action can be commenced in circuit court. Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(a)(1). The Health Claims Arbitration Office has authority only over cases that fall within the scope of the Act. See, e.g., Watts v. King, 794 A.2d 723, 733 (Md. Ct. Spec. App. 2002) ("It is true that, although CJ § 3-2A-02(a) requires that all claims shall be submitted to the HCAO for arbitration, intentional torts may be excluded from the

7

Act's jurisdiction." (internal quotation marks and alteration omitted)).

The Act defines "medical injury" as "injury arising or resulting from the rendering or failure to render health care." Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01(f). The Maryland courts have set forth standards for determining which claims meet this definition and thus fall within the scope of the Act:

> [T]he Act covers only those claims for damages arising from the rendering or failure to render health care where there has been a breach by the defendant, <u>in his professional capacity, of his duty to exercise his professional expertise or skill</u>. Those claims for damages arising from a professional's failure to exercise due care in non-professional situations such as premises liability, slander, assault, etc., were not intended to be covered under the Act and should proceed in the usual tort claim manner.

Cannon v. McKen, 459 A.2d 196, 201 (Md. 1983) (emphasis added).

> Where a plaintiff alleges that he or she was injured by a health care provider during the rendering of medical treatment or services, the Act is implicated, regardless of whether the claim sounds in negligence or intentional tort. When confronted with such a claim, the trial court must determine if the plaintiff's factual allegations remove the claim from the Act's coverage. <u>If the complaint sets forth facts showing that the claimed injury was not inflicted during the rendering of medical services, or that the injury resulted from conduct completely lacking in medical validity in relation to the medical care rendered, the Act is inapplicable</u> . . . .

Goicochea v. Langworthy, 694 A.2d 474, 479 (Md. 1997) (emphasis added).

The language in NCRIC's policy obviously is not identical to the language of the Maryland statute or the standard used by

8

Maryland courts to apply that statutory language. Nonetheless, we agree with the parties that there is sufficient similarity such that the cases discussing the scope of the Act provide guidance on the issue before us. The question, then, is whether Daniel's conduct was so completely lacking in medical validity that it cannot be considered the "furnishing of professional medical services" as covered by the policy.

If the only conduct at issue in this case were Daniel's sexual assaults, then we might agree with NCRIC and the district court that Daniel's actions did not arise from the furnishing of medical services. Professional malpractice insurance does not protect against all negligence of a person who happens to be a professional; it is intended to protect against negligence that occurs during the course of the professional's exercise of his special skills and training. Although Maryland does not appear to have directly addressed this question, many courts have concluded that, except in cases involving psychiatrists or other therapists, sexual misconduct by a doctor is not covered by a professional malpractice insurance policy. See, e.g., Niedzielski v. St. Paul Fire & Marine Ins. Co., 589 A.2d 130 (N.H. 1991); St. Paul Fire & Marine Ins. Co. v. Mori, 486 N.W.2d 803 (Minn. Ct. App. 1992). Sexual assault is typically viewed as being so far beyond the bounds of professional medical treatment and so disconnected from an exercise of the doctor's professional skills and training that

9

courts have concluded a sexual assault by a doctor does not amount to medical malpractice.

In this case, however, Ball's complaint is not based only on Daniel's sexual misconduct. Daniel advertised himself as providing in-house medical treatment, and Ball sought him out for treatment of migraines and depression. Daniel came to her house and purported to treat those problems by injecting Ball with various drugs, including Demerol, Vistaril, Valium, and Fiorinal. Ball's claim against Daniel is based, in large part, on her contention that Daniel failed to properly administer these drugs by giving them to her in amounts that caused her to become addicted. At least some of the drugs given to Ball by Daniel are commonly used to treat the problems from which Ball suffered. See, e.g., Baker v. Apfel, 159 F.3d 1140, 1143 (8th Cir. 1998) (noting that "[t]he only effective pain medication for the migraines is an injection of Demerol"); Beckley v. Apfel, 152 F.3d 1056, 1058 (8th Cir. 1998) (noting that claimant took Fiorinal to treat migraine headaches). Under these circumstances, we cannot say that Daniel's actions in administering the drugs were completely lacking in medical validity. Ball's claim with regard to Daniel's misuse of the drugs therefore falls within the scope of the risk covered by NCRIC's policy.

NCRIC, however, contends that Daniel did not give Ball these drugs for the purpose of treating her migraines and depression, but

10

instead gave her the drugs to carry out his scheme to addict her and render her incapable of rejecting his sexual advances. NCRIC bases this argument on Ball's deposition testimony, during which she stated that she believed that Daniel was trying to get her addicted to drugs. Ball also stated in her deposition that she agreed with her attorney who argued before the Health Claims Arbitration Panel that Daniel purposefully and maliciously gave her drugs to get her addicted. Based on these statements, NCRIC contends that the "undisputed facts" are that Daniel never undertook to treat Ball's ailments. See Brief of Respondent at 20 n.7. Thus, NCRIC argues that Daniel's administering of the drugs was completely lacking in medical validity and does not fall within the scope of the policy coverage.[1] We disagree.

Ball's subjective beliefs about what Daniel's intentions may have been simply are not determinative of the coverage question. What matters is the actual nature of the claim, not the label that the plaintiff attaches to the claim. See Jewell v. Malamet, 587 A.2d 474, 479 (Md. 1991) ("[T]he determination of jurisdiction in cases involving an intentional tort of a professional nature lies

---

[1]NCRIC also suggests that the injection of drugs requires no specialized learning or skills, so that Daniel's administering of the drugs to Ball cannot be viewed as the provision of professional medical services. NCRIC claims that to conclude otherwise "would be to equate a street heroin addict with a doctor of more worthy morals." Brief of Respondent at 23. This argument is without merit. While it may be true that shots can be given by those who are not doctors, that does not mean that a doctor is not using his professional skills when giving a shot.

11

not in the label given to the tort, but on the factual context in which the tort was allegedly committed." (internal quotation marks and alterations omitted)); see also Goicochea, 694 A.2d at 479 (rejecting plaintiff's attempt to turn medical malpractice case into an intentional tort case by alleging that the doctor acted maliciously).

As previously discussed, Ball's claim falls within the scope of the policy because it springs from Daniel's furnishing of professional medical services, services that were not completely lacking in medical validity. Ball's personal beliefs about why Daniel acted as he did does not change this conclusion.

C.

Finally, we turn to the district court's conclusion that NCRIC was not obligated to provide coverage for Ball's claim because Daniel knew or should have known about her claim when the policy was issued.

The policy issued by NCRIC states that coverage "is limited to liability for only those claims which arise from incidents occurring subsequent to the retroactive date stated in the declarations and schedule page and which are first made against the insured while the policy is in force." J.A. 69. The retroactive date of the NCRIC policy was March 19, 1987. Daniel began treating Ball in April 1987, and we decided in the previous appeal that Ball

12

provided timely notice to NCRIC of her claim.  Thus, Ball's claim seems to fall within the coverage period of the policy.

The policy, however, also contains an exclusion ("Exclusion (f)"), which excludes coverage for liability "for any potential claim against the insured of which the insured is aware, or reasonably should have been aware, <u>as of the date this policy is issued</u>, regardless of whether or not such claim has yet been made or reported to any insurer."  J.A. 72 (emphasis added).  Although the policy's retroactive date is March 19, 1987, the policy was formally issued on May 21, 1987.  The district court concluded that by the time the policy was issued in May 1987, Daniel reasonably should have known of Ball's potential claim against him.  The district court therefore concluded that Exclusion (f) operated to remove Ball's claim from coverage under the policy.

On appeal, Ball contends that the policy is ambiguous because it states that it covers claims arising after the retroactive date, but then excludes claims about which Daniel should have been aware on the issuance date, without defining issuance date.  And because the policy is ambiguous, Ball argues, we should construe it in her favor.  <u>See, e.g.</u>, <u>Mamsi Life & Health Ins. Co. v. Callaway</u>, 825 A.2d 995, 1005-06 (Md. 2003) ("Although Maryland law does not construe insurance policies as a matter of course against the insurer, when a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of

13

the contract which is usually the insurer." (citation omitted)). We disagree with Ball's argument.

Although the policy states that it covers claims for incidents occurring after the retroactive date, the policy also makes clear that the grant of coverage is subject to the other terms of the policy, which of course includes the policy exclusions. And contrary to Ball's suggestion, the policy cannot be considered ambiguous simply because it includes provisions that operate to preclude coverage that would otherwise be granted. That is exactly what exclusions are intended to do.

Nor can we conclude that Exclusion (f) is ambiguous because the policy does not define date of issuance. The declarations page of the policy expressly identifies May 21, 1987 as the policy's issue date. See J.A. 642. While no provision in the policy explains the time frame under which the policy would be issued, that omission does not make the exclusion ambiguous.

> A contract term is determined to be ambiguous if a reasonably prudent person would understand the term as susceptible to more than one possible meaning. The determination of whether language is susceptible to more than one meaning includes consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.

Id. at 1005 (citation and internal quotation marks omitted). "Unless there is an indication that the parties intended to use words in the policy in a technical sense, the terms of the contract are accorded their customary, ordinary, and accepted meanings."

14

Walk v. Hartford Cas. Ins. Co., 852 A.2d 98, 106 (Md. 2004). When the policy is read as a whole, it is clear that the policy was issued for purposes of Exclusion (f) when it was compiled and delivered to Daniel, a date identified in the policy as May 21, 1987. That the date of issuance is different from the retroactive date simply does not make the exclusion ambiguous.

The question, then, is whether Exclusion (f) operates to remove Ball's claim from the coverage provided by NCRIC's policy. We are constrained to answer that question in the affirmative.

The record establishes that by the time the policy was issued on May 21, 1987, Daniel had visited Ball multiple times, administering drugs each time, and had sexually assaulted her at least once. Daniel had by that time told Ball that she was addicted to the narcotics he had been giving her, and (again, before the date of the policy issuance), Ball had checked herself into a hospital seeking treatment for the addiction. Given these facts, a reasonable person would have known before the policy was issued that Ball had a claim against Daniel. While Ball had not sued Daniel or even made a complaint against him by the time the policy was issued, Exclusion (f) by its terms applies to potential claims of which the insured "reasonably should have been aware," whether or not the claim has actually been made. Accordingly, we agree with the district court that, by virtue of Exclusion (f),

15

Ball's claim against Daniel is excluded from the policy issued by NCRIC.

Ball, however, contends that because Daniel continued to treat her after the policy was issued, Exclusion (f) does not preclude coverage for her claim. In support of this argument, Ball relies on Mutual Fire, Marine & Inland Insurance Co. v. Vollmer, 508 A.2d 130 (Md. 1986).

In Vollmer, a malpractice insurance policy issued to a doctor provided coverage for malpractice committed after the policy's retroactive date and excluded coverage for malpractice occurring before the retroactive date. The plaintiff's complaint alleged a related series of acts of malpractice, some of which occurred before the retroactive date and some of which occurred after the retroactive date. The Vollmer court concluded that the policy was ambiguous because "[t]he policy is silent on its application where malpractice is alleged to have been committed both before and after the retroactive date." Id. at 134. The court therefore "resolve[d] the ambiguity against the drafter of the policy and in favor of coverage." Id.

The specific language of NCRIC's policy, however, makes Ball's "continuing treatment" analysis inapplicable and her reliance on Vollmer unavailing. The policy provides coverage for claims "caused by a medical incident." J.A. 71. As to "medical incident," the policy states that "[a]ny such act or omission

16

together with all related acts or omissions in the furnishing of such services to any one person shall be considered one medical incident." J.A. 75. Under this provision, Daniel's actions that occurred before the policy issuance date were clearly related to the actions that occurred after the issuance date. Thus, there was only one medical incident, one that Daniel reasonably should have known about before the policy issued. Unlike the policy at issue in Vollmer, the NCRIC policy is not ambiguous. By treating related actions as a single medical incident and excluding coverage for medical incidents about which Daniel should have known by the issuance date, the policy simply forecloses Ball's continuing-treatment argument.

We therefore agree with the district court that Exclusion (f) applies so as to take outside the scope of the policy's coverage the claims asserted against Daniel by Ball. Although we have concluded that the district court erred in its analysis of the other issues in this case, our conclusion with regard to Exclusion (f), standing alone, is sufficient to support the district court's judgment.[2] Accordingly, for the foregoing reasons, the district

---

[2]At oral argument, counsel for NCRIC suggested that Exclusion (f) operates to bar coverage only as to Daniel's actions occurring before the policy was issued, and that coverage is barred for actions occurring after the policy was issued because Daniel's conduct did not involve the provision of professional services. In its appellate brief, however, NCRIC made it clear that each of the district court's bases for ruling in favor of NCRIC were independently sufficient to support the district court's decision. Thus, the statement at oral argument suggesting that Exclusion (f)

17

court's decision granting summary judgment in favor of NCRIC is hereby affirmed.

AFFIRMED

---

alone would not completely preclude recovery under the policy was likely an inadvertent misstatement. In any event, because the relevant provisions of the NCRIC policy are unambiguous, the meaning of the policy is a question of law to be resolved by this court. See, e.g., Vizzini v. Insurance Co. of North Am., 273 A.2d 137, 140 (Md. 1971) ("[T]he interpretation of an unambiguous insurance contract is a question of law for the court. . . ."). The statement by NCRIC's attorney, inadvertent or not, is therefore not binding on this court. See New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24-25 (4th Cir. 1963) ("The doctrine of judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case. When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission and sets up no estoppel which would prevent the court from applying to the facts disclosed by the proof, the proper legal principles as the Court understands them. . . . [A] party's misconception of the legal theory of his case does not work a forfeiture of his legal rights.").

18